IN THE MATTER OF MARCIA S. KASDAN, AN ATTORNEY AT LAW.

Decided June 19, 1989.

## ORDER

The Disciplinary Review Board having filed a report with the Supreme Court recommending that MARCIA S. KASDAN, of ENGLEWOOD CLIFFS, who was admitted to the Bar of this State in 1978, be suspended from the practice of law for three

months and that her restoration to the practice of law be conditioned by the requirement that her resumption of the practice of law be under the supervision of a proctor for two years;

And the Disciplinary Review Board's recommendation having been reached on its balancing of its findings of numerous instances of unethical conduct, including instances where respondent misrepresented the status of matters to clients and failed to communicate with them, in violation of *DR* 1–102(A)(4) and *DR* 7–101(A)(2) and in being grossly negligent by closing title in a matter without collecting sufficient funds from her clients, in violation of *RPC* 1.1(a);

And this Court having fully reviewed the record, and good cause appearing;

It is ORDERED that the findings of the Disciplinary Review Board are hereby adopted, and MARCIA S. KASDAN is suspended from the practice of law for three months, effective July 17, 1989, and until further order of the Court; and it is further

ORDERED that the Decision and Recommendation of the Disciplinary Review Board, together with this order and the full record of the matter, be added as a permanent part of the file of said MARCIA S. KASDAN as an attorney at law of the State of New Jersey; and it is further

ORDERED that MARCIA S. KASDAN be restrained and enjoined from practicing law during the period of her suspension; and it is further

ORDERED that MARCIA S. KASDAN comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with suspended attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs incurred in the prosecution of this matter.

*Decision and Recommendation of the
Disciplinary Review Board.*

To the Honorable Chief Justice and Associate Justices of the Supreme Court of New Jersey.

These matters are before the Board based upon three presentments filed by the Districts IIA and IIB (Bergen County) Ethics Committees.

*The Frumkin Matter*

In May 1981, Israel Frumkin retained respondent to represent him in an action against his landlord for the return of the security deposit and the payment of damages in excess of $3,000.

Eager to determine the status of his case, Frumkin telephoned respondent's office twice a week between September and December 1981. Respondent rarely returned his telephone calls.

In early 1982, respondent informed Frumkin that a complaint had been filed. Thereafter, respondent forwarded interrogatories to Frumkin in April 1982, which Frumkin answered and returned within one day. Respondent, however, never furnished the answers to her adversary in the lawsuit. As a result, the complaint was dismissed on May 21, 1982. Respondent neither informed Frumkin of the dismissal of the complaint nor filed a motion for its reinstatement.

Between September 1982 and July 1983, respondent made numerous misrepresentations to Frumkin that trial dates had been scheduled and adjourned for various reasons. In early 1984, Frumkin took it upon himself to call the court to determine the status of the matter. He was advised, at that time, that his suit had been dismissed for failure to answer interrogatories. When confronted by Frumkin, respondent denied the dismissal and continued to insist that Frumkin would "get a check" very soon. As of the date of the ethics hearing on May

17, 1985, Frumkin had not received any monies representing a recovery from or a settlement of his lawsuit.

The presentment found that respondent's conduct in this matter had been unethical when she failed to respond to Frumkin's reasonable requests for information and when she misrepresented the status of the matter to him, by failing to advise him of its dismissal and by providing him with false trial dates.

Respondent also represented Frumkin, in 1983, in connection with the incorporation of a business and with the purchase of a condominium unit. In the incorporation matter, Frumkin complained that respondent had never delivered the corporate "kit" to him. The committee found that respondent's conduct had not been unethical because it constituted "common practice" and because there was no evidence that Frumkin had ever demanded the "kit."

With regard to the condominium purchase, it appears that Frumkin was to receive a $250 credit at the closing of title. Although Frumkin believed that he was to receive the $250 sum as a direct payment, the closing statement indicates that he received a credit in that amount. Accordingly, the committee found no evidence of wrongdoing on the part of respondent with respect to this transaction.

*The Ploshchansky Matter*

In July 1982, respondent was retained by Aida and Peisak Ploshchansky to represent them in connection with the purchase of a condominium unit. The purchase price was $130,000. A $90,000 loan was to be obtained either through a lending institution or by means of a purchase money mortgage held by the sellers. After the sellers' attorney prepared the contract of sale, respondent obtained the Ploshchanskys' signature thereon and forwarded a $13,000 deposit to the attorney. Pursuant to the terms of the contract, the transaction was to be contingent upon the Ploshchanskys' ability to obtain a conventional mortgage commitment from a mortgage lender in the amount of

$90,000. Alternatively, the contract provided for a purchase money mortgage by the sellers in the amount of $90,000.

The sellers, however, were unwilling to agree to either mortgage contingency clause. When their attorney returned the contract to respondent, both clauses had been stricken and initialed by the sellers. The attorney requested that the Ploshchanskys also initial the changes.

By letter dated October 22, 1982, respondent returned the contract to the attorney, informing him that it had been initialed by Mrs. Ploshchansky and that Mr. Ploshchansky had verbally approved the omission of the clauses. Respondent also changed the closing date from November 15 to November 30, 1982. Although respondent agreed to assist the Ploshchanskys in arranging for a mortgage, she did not submit an application on their behalf until late December 1982. On December 2, 1982, the sellers' attorney sent a time-of-the-essence letter for a December 10, 1982 closing. Respondent did not inform the Ploshchanskys of that closing date. After several closing dates had gone by, the sellers' attorney announced directly to Mrs. Ploshchansky that it was the sellers' intention to declare the contract null and void and to retain the deposit monies.

Understandably distressed by this significant development, the Ploshchanskys attempted to contact respondent on numerous occasions to determine the status of the transaction. Their calls were ignored. When they were finally able to reach respondent at her home, she told them "not to worry." Pursuant to respondent's testimony, she paid $750 to the sellers out of her own funds, presumably as an increase in the purchase price, in order to obtain their consent to the extension of the first time-of-the-essence closing date from December 10, 1982, to January 14, 1983.

Realizing the urgency of the matter, the Ploshchanskys retained new counsel, who commenced an action on April 5, 1983, to prevent a forfeiture of the deposit monies. On May 31, 1983, represented by new counsel, the Ploshchanskys took title to the

condominium unit at an increased price of $138,000, financed by a mortgage of $90,000 and by a purchase money mortgage from the sellers in the amount of $10,500. The $13,000 deposit was fully credited to them. Thereafter, the Ploshchanskys filed a malpractice action against respondent, which resulted in a settlement of $13,000 in favor of the Ploschanskys.

By letter dated July 18, 1984, the committee investigator forwarded to respondent a copy of the Ploshchansky grievance, requesting a written reply. Not having received any response, the investigator sent a follow-up letter on October 1, 1984. On October 11, 1984, the investigator discussed the matter with respondent and sent her a copy of the July 18, 1984 grievance letter. By letter dated October 23, 1984, the investigator advised the committee that respondent had not been cooperative and recommended that a formal ethics complaint be filed.

At the conclusion of the ethics hearing, the presentment found that respondent had exhibited gross negligence throughout the entire transaction, had failed to respond to the Ploshchanskys' numerous requests for information, and had failed to disclose to them the reality of the situation, once time-of-the-essence was declared. The committee did not find, however, that respondent's failure to cooperate with the committee investigator was such as to constitute an ethics violation.

*The Greenberg Matter*

On May 1, 1984, Richard Greenberg retained respondent to appeal from and/or to file a motion for reconsideration of a decision concerning his summer visitation with his son and other matters relating to a joint custody arrangement which he shared with his former wife. Respondent informed Greenberg that she would attempt to have the decision reconsidered, rather than file an appeal.

Pursuant to Greenberg's testimony, he repeatedly telephoned and wrote to respondent, requesting copies of all papers that she had prepared on his behalf. His telephone calls and letters produced no response from respondent. Acting on the advice

of respondent, Greenberg appeared in court on June 15, 1984, the alleged return date of the motion for reconsideration. The matter, however, was not listed on the court's calendar for that day, for the simple reason that respondent still had not filed the motion.

On June 29, 1984, respondent again advised Greenberg that he should appear in court for the return date of the motion. At the courthouse, respondent informed Greenberg that his former wife had made an *ex parte* application for an adjournment of the motion, which had been granted.

On July 15, 1984, Greenberg appeared in court for the third time, arriving at 9:30 a.m., pursuant to respondent's instructions. Upon entering the courthouse, Greenberg was informed by respondent that the motion had already been heard, that his former wife had appeared for oral argument, and that the court had ordered a plenary hearing. This was untrue. Greenberg was subsequently advised by his wife that she had not been in court on that date. When Greenberg attempted to obtain a transcript of the oral argument, he discovered that no papers had been filed with the court. On September 1, 1984, Greenberg terminated respondent's representation and hired new counsel, who filed a new application on his behalf.

Additionally, on numerous occasions respondent failed to communicate with Greenberg about the status of the matter. Greenberg's telephone calls and letters to respondent remained unanswered.

At the conclusion of the ethics hearing, the presentment found that respondent had failed to communicate with her client, had failed to act in his best interest, had failed to carry out her contract of employment, had acted with gross negligence, and had made several misrepresentations to her client.

*Bona Fide Office*

Respondent was charged with a violation of *R.* 1:21–1(a), which requires that an attorney maintain a *bona fide* office for the practice of law in the state of New Jersey.

Respondent, who was also admitted to the practice of law in the state of New York, maintains an office in the lower level of her house. Professional office use is permitted in the zone in which the house is located. In the office portion of her home, respondent maintains two desks, an office chair, a conference table, word processing equipment, a photocopier, a typewriter, a telephone and a telephone answering machine, eight file cabinets, and a safe. She employs a part-time secretary, who works 20 hours a week.

Although the presentment found that there had been ample evidence that respondent had failed to communicate with clients who telephoned her New Jersey office, it concluded that the record did not establish a violation of the rule requiring the maintenance of a *bona fide* office.

*The Lang Matter* [1]

On June 27, 1986, respondent represented Jacob and Mary Lang in connection with their purchase of real property. As the closing statement indicates, there were two mortgage loans encumbering the property, in the approximate combined amount of $34,000. The total cash amount due from the Langs, at closing, was $6,969.29. See C-2 introduced into evidence at the ethics hearing of October 21, 1987.

As the Langs' closing attorney, it was respondent's responsibility to utilize a portion of the closing proceeds to satisfy the two existing mortgages on the premises. Respondent testified, at the October 21, 1987 ethics hearing, that she collected three uncertified personal checks from the Langs, totaling $6,969.29. She testified further that she deposited the checks into her trust account and that she was unable to pay off the second mortgage when one of the checks was dishonored. Contrary to this testimony, however, in a letter sent to the accountant who audited her books and records several months following the

[1] The committee and the Board transcripts at times refer to this matter as the Strother matter.

closing, respondent admitted that the Langs had not brought their checkbook to the closing and that she had made an appointment for them to come to her office two days later, for the purpose of giving her the balance of the cash due at closing. See C–3 admitted into evidence at the ethics hearing of October 21, 1987. Several months after the closing of title, the second mortgage was finally cancelled of record.

Following the conclusion of the ethics hearing, the present-ment found that respondent had been guilty of misrepresenta-tion when she prepared and delivered a closing statement indicating that she had collected sufficient monies from the Langs to make up the balance of the purchase price.

*The Malakoff Matter*

In April 1984, Irving Malakoff retained respondent to repre-sent his son in connection with the purchase of a dry cleaning business. Malakoff tendered a $3,500 deposit and gave respon-dent $1,250 to be paid to a broker, who was to procure an S.B.A. loan.

After the broker was unable to obtain the loan, the transac-tion aborted. The broker, however, did not return the $1,250 fee, which was non-refundable. Malakoff then complained to respondent, contending that he had not been informed that the fee was non-refundable. Respondent, in turn, reminded Mala-koff that she had so advised him at the inception of the transaction. In order to reach a compromise, respondent agreed to return one-half of the brokerage fee out of her own funds.

Following the conclusion of the ethics hearing, the committee recommended the dismissal of this count of the Malakoff com-plaint for lack of clear and convincing evidence that respon-dent's conduct had been unethical.

Malakoff also complained that respondent had assured him that she would institute suit for the return of the $3,500 deposit. At the ethics hearing, however, respondent disputed Malakoff's contention. She testified that she had referred the

matter to another attorney, with Malakoff's knowledge and consent. Following the ethics hearing, the committee also recommended the dismissal of this count of the Malakoff complaint for lack of clear and convincing evidence of unethical conduct by respondent.

Additionally, Malakoff complained about respondent's conduct in connection with a real estate transaction in which he and two other partners were involved as purchasers. In this transaction, Malakoff and his partners were represented by an attorney who also represented one of the partners in an unrelated matter. When the transaction was cancelled because of the partners' inability to raise the necessary funds, Malakoff consulted with respondent about any legal remedies that might be available to him. According to Malakoff's testimony, respondent advised him to pursue a claim against the attorney, in light of the obvious conflict of interest raised by the dual representation. Malakoff and respondent discussed a lawsuit for damages in an amount exceeding $100,000.

Although Malakoff's and respondent's testimonies at the committee hearing differ with respect to certain allegations concerning the filing of the suit—Malakoff contending that respondent had informed him on several occasions that a suit had been filed and respondent denying this contention [2]—it is undisputed that, in Malakoff's presence, respondent personally prepared a typewritten document in pleading form, titled "Affidavit in Support of Order to Show Cause." See Exhibit C–1 introduced into evidence at the ethics hearing of October 21, 1987.

Exhibit C–1 recites, in pertinent part, that "[i]n accordance with the terms of the last Court hearing discovery was set in this matter and was to be complete on or before January 9,

---

[2] At the Board hearing, however, respondent admitted that she had advised Malakoff that "[she] was beginning suit, and [she] did not". T39–24 to 25.

1987." The contents of the affidavit were false inasmuch as respondent still had not instituted suit.

Following the conclusion of the ethics hearing, the presentment found that respondent had made numerous misrepresentations to Malakoff that an action had been initiated in his behalf and had prepared a document for the purpose of misleading Malakoff that litigation was pending.

## The Gershon/Cowart Matter [3]

In 1985, respondent represented Eric Gershon in a lawsuit instituted by an individual who had sold him a business. The litigation arose from Gershon's default on a $50,000 promissory note evidencing Gershon's financial obligations in the transaction. After a default judgment was entered against Gershon, the judgment-creditor began to take steps to execute on the judgment. Gershon's bank accounts were attached and some of the business' vehicles were seized.

Settlement negotiations ensued. Respondent and her adversary in the matter agreed that Gershon would make scheduled payments toward the satisfaction of the judgment, the first installment payment to be in the amount of $10,269.18.

In order to discharge his indebtedness, Gershon reached an agreement with Virginia Cowart, whom respondent had represented in other matters, whereby Cowart would lend him sufficient monies to cover the first installment payment. Although respondent's and her adversary's testimonies are in direct conflict with respect to any instructions respondent might have given the adversary about the immediate disposition of those funds, it is clear that, on July 23, 1985, respondent issued a trust account check in the amount of $10,269.18. On that same date, at 11:00 p.m., the judgment-creditor himself picked up the check at respondent's office. It is respondent's contention that, at that time, she instructed the judgment-creditor to advise his

---

[3]The committee and the Board transcripts at times refer to this matter as the Skoblar matter.

attorney to "hold" the check for a few days, in light of certain problems that had developed with the transfer of Cowart's funds from a money market account to respondent's trust account. It is also respondent's contention that, immediately upon being apprised of the delay incurred in the transfer of the funds, she attempted to contact the attorney whom she was unable to reach.

Respondent explained that, because she would be leaving on the next day for a one-week cruise, she had left specific instructions with her secretary to call the attorney's office and to request him to withhold the deposit of the check. The attorney denies receiving any written or oral instructions from respondent in this regard.

On July 25, 1985, the attorney deposited the funds into his trust account. After he waited a few days for the funds to clear, the attorney wrote a check to his client and to himself as co-payees. Some of the attorney's trust account checks were subsequently returned for insufficient funds. When the attorney confronted respondent, she gave him a certified check, covered with funds provided by Gershon. It was not until August 2, 1985, that the Cowart check was deposited in respondent's trust account. Respondent conceded that, at the time that she issued the check on July 23, 1985, there were insufficient funds in her trust account to cover it.

At the conclusion of the ethics hearing, the presentment found that respondent had knowingly issued a check with insufficient funds in her trust account and had made misrepresentations to her adversary with regard to the issuance and use of the trust account check.

The second count of this ethics complaint alleges that respondent used Cowart's funds for the benefit of Gershon, prior to obtaining his signature on a promissory note evidencing Gershon's obligations to Cowart. The presentment found that respondent had not exercised due diligence with respect to her obligations to Cowart, by allowing Gershon to utilize the funds

without the benefit of a promissory note for a period of 20 days.

## CONCLUSION AND RECOMMENDATION

Upon independent *de novo* review of the full record, the Board is satisfied to a clear and convincing standard that respondent is guilty of unethical conduct. The Board, however, does not concur with the committee's specific findings as to the disciplinary rules violated in each instance.

■ In the Frumkin matter, respondent did not disclose to her client that the complaint had been dismissed as a result of her failure to provide answers to interrogatories. Compounding this transgression are the numerous subsequent misrepresentations which respondent made to Frumkin when she affirmatively assured him that the matter was still pending and when she fabricated trial dates to mislead him into believing that the litigation was proceeding apace. Public confidence in the bar is diminished when an attorney represents to a client that the case is proceeding smoothly when the attorney knows that it is not. Clients should not continue to suffer the consequences of being told that their case is under control, when it is not. *In re Goldstein,* 97 *N.J.* 545, 549 (1984).

The Board finds that respondent's misrepresentations to Frumkin and failure to communicate with him were unethical and in violation of *DR* 1–102(A)(4) and *DR* 7–101(A)(2).

With respect to the Ploshchansky matter, the Board finds that respondent's conduct was unethical when she ignored her clients' numerous requests for information, in violation of *DR* 7–101(A)(2). An attorney's failure to communicate with a client diminishes the confidence the public should have in members of the bar. *In re Stein,* 97 *N.J.* 550, 563 (1984). The Board is unable, however, to concur with the committee's finding that respondent acted with gross negligence and that she made a number of misrepresentations to her clients. The proofs are

simply not clear and convincing. *See In re Pennica*, 36 *N.J.* 401 (1962).

Similarly, after its independent canvass of the record, the Board is unable to conclude that respondent exhibited gross negligence in the Greenberg matter. The Board does find, however—as did the committee—that respondent ignored her client's requests for information about the status of the matter and that respondent, on at least three separate occasions, fabricated scheduled court appearances for the purpose of deceiving her client into believing that the matter was progressing. The Board concludes that respondent's conduct was unprofessional and violative of *DR* 7–101(A)(2) and *DR* 1–102(A)(4).

■ The Board is particularly disturbed with respondent's conduct in the *Lang* matter. When an attorney undertakes to represent the buyers of real property, he must utilize a portion of the funds that he has collected at closing to pay off all liens encumbering the property to ensure that the buyers acquire clear and marketable title. The duty of fidelity owed by the attorney extends, as well, to the bank providing the funds to purchase the property. To be sure, it is the responsibility of the sellers' attorney to make certain that the financial obligations for which the sellers are responsible—such as existing mortgage loans, for example—are promptly discharged after the closing of title. As a matter of practice, however, the buyers' attorney segregates from the purchase price sufficient funds to pay off all outstanding judgments, loans, mortgages, liens, or encumbrances affecting the property in order (a) to obtain clear title for the buyers and (b) to ensure that the buyers' mortgagee has a first lien on the property. In other words, while the sellers may be incidentally benefited by the payment of existing liens, the buyers' attorney owes to his clients the duty of removing all clouds on the title. Similarly, by accepting the "letter of instructions" from the lending bank prior to the closing title, the buyers' attorney agrees to ensure

that all liens on the mortgaged property are expeditiously removed to fulfill the bank's expectations that its mortgage will be a first lien on the property. As stated previously, albeit in a distinct context, an attorney's professional obligation may reach persons who have reason to rely on him even though they are not clients. *In re Katz*, 90 *N.J.* 272, 284 (1982), citing *In re Lambert*, 79 *N.J.* 74, 77 (1979).

Here, respondent not only failed to collect a bank, cashier's, or certified check from her clients—the purchasers of the property—but, more importantly, she also failed to collect sufficient funds to make up the balance of the purchase price. It was not until several months after the closing of title that respondent finally collected sufficient funds from her clients to pay off the second mortgage on the property and satisfy the obligations she owed to her clients and to their mortgagee.

Although the Board is unable to concur with the committee's finding that respondent was guilty of misrepresentation—the record does not disclose the intent to deceive anyone—it is clear that respondent acted with gross negligence when she closed title without collecting sufficient funds from the Langs. *RPC* 1.1(a).

█ Of equal concern to the Board is respondent's conduct in the Gershon/Cowart matter. With the knowledge that there were insufficient funds in her trust account, respondent delivered a check to another attorney whose trust account checks were subsequently dishonored. Whether respondent instructed the attorney not to deposit the check until the funds were transferred is irrelevant. The impropriety of the conduct lies in drawing against uncollected or undeposited funds.

The risk in issuing a check prior to the actual transfer of funds is obvious. For a variety of reasons, the transfer may not take place, causing the check to be dishonored. *See Advisory Committee on Professional Opinion No. 609*, 120 *N.J.L.J.* 1113 (1987). *R.* 1:19–6. There was no compelling need for respondent to deliver the check to the attorney prior to the

actual transfer of funds. Her explanation that she intended to placate the judgment-creditor is unpersuasive. Her conduct was unethical and below the standards expected of the members of the legal profession.

The Board cannot, however, find support in the record for the committee's conclusion that respondent was derelict in her duties to Virginia Cowart. There is no clear and convincing evidence that respondent represented Cowart in the loan transaction with Gershon. The Board, therefore, recommends the dismissal of this count of the Gershon/Cowart ethics complaint.

Respondent's most serious dereliction took place in the Malakoff matter. There, respondent made numerous misrepresentations to her client that she had filed suit on his behalf. When the client continued to exert pressure on respondent for some sort of verification that litigation was indeed pending, respondent, in the client's presence, drafted and typed a false pleading for the purpose of deceiving the client into believing that suit had been instituted. *R.P.C.* 8.4(c). The Board finds this deceptive practice inexcusable and deplorable. That Malakoff was a difficult client does not in any way exonerate or mitigate respondent's unethical behavior. Truthfulness and professionalism are paramount in an attorney's relationship with the client.

Having determined that respondent's conduct was unethical, the Board must recommend the imposition of discipline which comports with the seriousness of the infractions.

█ The Court has consistently held that intentionally misrepresenting the status of lawsuits warrants public reprimand. *In re Dreier*, 94 *N.J.* 396 (1983); *In re Rosenthal*, 90 *N.J.* 12 (1982); *In re Ackerman*, 63 *N.J.* 242 (1973); *In re Bloom*, 60 *N.J.* 113 (1972). Here, however, in addition to numerous instances of misrepresentation, respondent persistently failed to communicate with her clients, failed to collect sufficient funds at a closing of title, issued a trust account check against uncollected funds, fabricated trial dates, and prepared a false

pleading with the intent to deceive her client into believing that litigation was pending.

The Court recently suspended for a period of six months an attorney who grossly neglected two matters, admitted similar neglect in five other matters, ignored his clients' requests for information and misrepresented the status of these matters. *See In the Matter of Cullen*, 112 *N.J.* 13 (1983). In another recent case, the Court publicly reprimanded an attorney who, on two separate occasions, misrepresented to his clients that their suits had been settled and who obtained the clients' signatures on settlement releases. In fact, one suit had been dismissed and the other had never been instituted. In a third matter, that attorney sent to the client's new counsel a brief containing a different docket number, with different parties, when no action had been filed. In imposing only a public reprimand and 100 hours of *pro bono* legal services, the Court considered that the attorney was suffering from a "panic disorder" and depression at the time of the infractions, that he had compensated his clients for their injuries, and that he had fully cooperated with the ethics proceedings. *Matter of Serterides*, 113 *N.J.* 477 (1988).

In all disciplinary matters, public confidence in the bar requires the acknowledgment of the ethical infractions which must be sanctioned in a manner commensurate with the seriousness of the transgressions. The purpose of discipline, however, is not to punish the attorney, but to protect the public from the attorney who does not meet the standards of responsibility required of every member of the profession. *Matter of Templeton*, 99 *N.J.* 365, 374 (1985). The quantum of discipline must accord with the seriousness of the misconduct in light of all relevant circumstances. *In re Nigohosian*, 88 *N.J.* 308, 315 (1982). Mitigating factors are, therefore, relevant and may be considered. *In re Hughes*, 90 *N.J.* 32, 36 (1982).

Respondent's unethical behavior, although serious, was unmarked by any attempt at personal gain. It appears from the

record that respondent's aversion to acquainting her clients with unfavorable tidings about their claims was motivated by her desire to please and pacify the clients, rather than by trickery and deception.

Respondent is a sole practitioner who divides her practice between New York and New Jersey. By her own account, she presently has "300 to 385" clients (BT 40–8) [4], an extremely active law practice. Respondent, however, is confident that she is now able "to counsel (her) clients a hundred percent on what is happening, whether it is good or bad" and that she has benefitted from her mistakes. (BT 40–10 to 14). Indeed, the presenter at the ethics proceedings advised the Board that it was the consensus of the committee that respondent "[had not done] anything to benefit herself. She [was] really trying to look out for her clients, but in a very warped way." (BT 45–16 to 25).

Moreover, beginning in 1982, members of her immediate family were beset with serious health problems. Respondent testified that in 1985, her middle child, then six years old, suffered a series of hospitalizations caused by a very severe condition in his inner ear, at which time respondent "lived during the night in hospitals and during the day in courtrooms." Subsequently, her youngest child, then sixteen months old, was hospitalized for two weeks with a diagnosis of meningitis. In addition, her father-in-law suffered two strokes and her brother-in-law, who had a heart condition, lived at her house for a time. Personal or emotional problems are mitigating factors in disciplinary proceedings. *See Matter of Tuso*, 104 *N.J.* 59 (1986).

Respondent assured the Board that her personal problems are all "behind [me] now. Unfortunately, I've gotten older now since that time, so I might have a new set of problems, but the truth of the matter is that, despite the fact that these problems

---

[4] BT denotes the transcript of the Board hearing on February 16, 1989.

are almost as awful as the ones I had before, I'm more grown up and I can deal with them a little bit better." (BT45–6 to 11).

Furthermore, contrition and admission of wrongdoing are mitigating factors to be taken into consideration in determining the proper discipline to be imposed. (Citations ommitted). *Matter of Miller*, 100 *N.J.* 537, 544 (1985). A review of the transcripts of the ethics proceedings reveals that respondent was embarrassed, humiliated and ashamed by her conduct.

Upon consideration of all the relevant facts, the Board unanimously recommends that respondent be suspended for a period of three months. But for the foregoing extensive mitigating factors, the Board would have recommended the imposition of harsher discipline. The Board further recommends that, upon reinstatement, respondent be subject to a two-year proctorship by an attorney selected by her and approved by the Board.

The Board further recommends that respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.