—— A.2d ——

IN THE MATTER OF MARCIA S. KASDAN,
AN ATTORNEY AT LAW.

Argued December 1, 1992—Decided April 30, 1993.

*Walton W. Kingsbery, III,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Dominic J. Aprile* argued the cause for respondent (*Bathgate, Wegener, Dugan & Wolf,* attorneys).

PER CURIAM.

This is an attorney-disciplinary case. The District Ethics Committee for Bergen County, District II–A–North (the "DEC" or "Committee"), filed complaints against respondent, Marcia S. Kasdan, in three matters. Hearings were held on a consolidated basis for all three matters before a hearing panel, which recommended public discipline with respect to each of the three complaints. After reviewing the matters the Disciplinary Review Board (the "DRB" or "Board") issued its Decision and Recommendation, recommending imposition of a three-year suspension and that reinstatement to the practice of law be subject to conditions.

The matter is before this Court in accordance with an order entered under *Rule* 1:20–5(a) requiring respondent to show cause why she should not be disbarred or otherwise disciplined.

I

Respondent was admitted to the practice of law in New Jersey in 1978 and maintained a law office in Englewood Cliffs. In 1990, the District IIA Ethics Committee filed three formal complaints. The complaints were based on respondent's representation of three clients, referred to as the "Davilla," "Wolkoff," and "Goldberg" matters. A critical factor in the Davilla and Wolkoff complaints is that respondent had been suspended from the practice of law under a disciplinary order of the Court when she represented those clients. The complaints charged respondent with violations of Rules of Professional Conduct ("*RPC*") 3.3(a)(1) (making false statements to a tribunal), 3.4(c) (disobeying an obligation under the rules of a tribunal), 1.15 (safekeeping property), and 8.4(c) (misrepresentation).

The DEC found respondent guilty of the offenses charged in the complaints and recommended public discipline. The DRB agreed with that determination, with certain differences. With respect to the charge that respondent had engaged in the practice of law while she was suspended from the practice of law for ethics violations, the DRB, unlike the DEC, determined that respondent's infraction constituted a failure to follow Guideline No. 23, which constituted a separate violation of *RPC* 3.4(c). Further, the DRB, unlike the DEC, did not find that respondent had knowingly disbursed client funds in violation of *RPC* 1.15 because no clear and convincing evidence demonstrated that respondent released funds without authorization.

We have independently reviewed the record and are satisfied that the findings of the DRB are comprehensive and accurate. We recapitulate the Board's summary of the salient facts:

### The Davilla Matter

On July 4, 1989, approximately two weeks before her three-month suspension in New Jersey was to begin, respondent sought a stay of her suspension in order to complete her representation of certain clients, including Ms. Davilla. On July 11, 1989, the Court denied her application for a stay. On July 17, 1989, the suspension took effect.

At the DEC hearing, respondent stipulated that, on July 25, 1989, she appeared before Judge Kulthau of the Superior Court of Middlesex County to argue a change-of-custody motion in the *Davilla* case. Thereafter, on July 8, 1990, she and her adversary met with Judge Kulthau to help resolve certain ambiguities arising from the transcription of the tape of the court proceedings on July 25, 1989. At no time from July 17, 1987 through January 8, 1990, did respondent tell her adversary or the judge of her suspension (C–1 in evidence). Respondent testified that she verbally advised her client of the suspension *after* the July 25, 1989 court appearance. She acknowledged that she never gave prompt written notice of the suspension, as required by Guideline No. 23, provided to her with the Court's order of suspension.

At the DEC hearing, respondent testified as follows:

"I was in error, I regret sincerely that I made this error. And upon realizing the extent of my error, which I do and I am sorry to have to appear before you in this manner, I tried to look for help. I realized that it was not acceptable to be a professional and not understand the limitation of that which you are allowed to do. And I understood the limitations, but somehow or other I allowed what I perceived as the needs of Miriam Devila [sic] and her baby infant son to interfere with the duties that I had sworn to uphold in the Court."

\* \* \* \* \* \* \* \*

## The Wolkoff Matter

In this matter, respondent stipulated that she failed to give notice of her suspension to either opposing counsel or the judge assigned to hear the matter and that she failed to act with candor in advising the court or her adversary of her suspended status, in violation of *RPC* 3.3(a)(1) and *RPC* 3.4(c) (C–1 in evidence). Respondent, however, denied that she represented Eugene Wolkoff while suspended.

The presenter called opposing counsel, Jeffrey Weinstein, and his associate, Cathy M. Abrams, to testify about their contact with respondent after her suspension on July 17, 1989. Mr. Weinstein testified that he talked with respondent about the child visitation rights and about the amount of support. Mr. Weinstein then produced a letter to Judge Boyle dated July 21, 1989, signed by respondent, in which she enclosed a proposed partial order confirming the court's decision of that date (C–6 in evidence). Mr. Weinstein had been sent a copy of the letter as opposing counsel. In addition, Ms. Abrams wrote a letter to respondent on August 2, 1989, complaining that she had not yet received a required check from respondent's client. At the bottom of that letter, respondent handwrote a response, enclosed her clients' check, and mailed it back to opposing counsel (C–10 in evidence).

Respondent called an attorney, Judith Fields, to testify that she had taken over the *Wolkoff* matter at the time of respondent's suspension. Ms. Fields testified that she argued the motion on July 21, 1989 and that she prepared the July 21 court order. She further testified that, because she was away on vacation at the end of July, respondent had sent the cover letter and order to

opposing counsel as a favor to her. Ms. Fields was a New York attorney who worked independently in respondent's office. She was not admitted in New Jersey. Although pro hac vice papers had been drawn up, they were never submitted to the court because respondent did not find a sponsoring attorney until September 1989.

Respondent testified as follows:

"There was testimony from Mr. Weinstein that I had several conversations with him. It is my testimony that I had one conversation with him. Ms. Fields was out of town in a bridge conference at that time and I did send a check in the mail that was due. Because without that check, Mr. Wolkoff would not have had visitation. I did send that in the mail to the law offices of the adversary, but I did not have any conversations with him whatsoever about any aspect of the case.... I did not write any papers in that case whatsoever outside of the original motion papers which were written by me prior to my suspension and were submitted prior to my suspension."

After opposing counsel became aware of respondent's suspension on September 21, 1989, he filed a motion to have her removed from the case, which motion was granted in November 1989. In addition to granting the motion, the judge also awarded $2,000 in legal fees to opposing counsel.

* * * * * * * *

## The Goldberg Matter

In June 1987, respondent was retained by Jeffrey Goldberg to handle the closing on the sale of his condominium. Respondent deposited in her trust account a $13,500 down payment from the buyers, which, by the terms of the contract of sale, was not to be released to the seller until July 27, 1987, the originally scheduled closing date. For reasons not relevant to these proceedings, the closing had to be postponed until August 21, 1987. Because of a dispute between the parties, however, the closing did not take place on that date. In fact, the closing never occurred. Thereafter, the purchasers filed a lawsuit for the return of the $13,500 deposit. By letter dated December 15, 1987, the purchasers' attorney asked respondent for information on the location of the escrow money and on the exact amount being held. Finally, on June 20, 1988, the purchasers' attorney received a letter from respondent, dated December 29, 1987, informing the attorney that the funds were being held in account number 010-1011578 at the Edgewater National Savings Bank. Requests for bank statements concerning the deposit went unanswered. It was not until March 1989, after a judgment was entered in their favor, that the purchasers discovered that the account balance was only $8,325, with an unexplained deficit of $5,175.

It was respondent's position that she had been given verbal authorization from the purchasers' attorney to release $5,000 to her client, following the postponement of the original closing date. After respondent provided the ethics investigator with five check numbers allegedly related to the missing $5,175, the OAE obtained copies of those checks from the bank. These checks are as follows:

Check 1229 dated August 3, 1987, made payable to Donna M. Lloyd, in the amount of $3,500.

Check 1231 dated August 3, 1987, made payable to Marcia S. Kasdan, in the amount of $75.

Checks 1233 dated August 3, 1987, made payable to Wally Paseman, in the amount of $100.

Check 1238 dated August 23, 1987, made payable to Marcia Kasdan, in the amount of $1,000.

Check 1239 dated August 23, 1987, made payable to Wally Paseman, in the amount of $500.

Respondent stipulated that these checks were drawn on the $13,500 amount being held in escrow in her trust account for the real estate transaction.

At the DEC hearing, respondent's client, Mr. Goldberg, testified that he received $3,500 by a check from respondent made out in his name and that he did not know anyone by the name of Donna M. Lloyd, the payee on one of the checks obtained by the OAE. Respondent then renounced the stipulation at the DEC hearing, maintaining that the check numbers she had given to the ethics investigator were related to another *Goldberg* closing that she had handled at that same time. Subsequent to the final hearing, respondent wrote to the DEC, readopting her initial version that these check numbers concerned the *Goldberg* closing at issue.

Throughout the DEC proceedings, respondent did not submit any records regarding the escrow funds or the specific checks or ledger sheets showing the disbursement of those funds. Respondent contended that the ledger sheets had been moved during construction on her house. When the DEC asked why she had not looked for the ledger sheets after the construction had ended, respondent offered no explanation.

Mr. Goldberg testified that, in July 1987, his car was about to be repossessed and his condominium to be taken over by the bank. He testified further that, when he asked respondent to release part of the deposit to him, she replied that, although the purchasers had agreed to release the deposit, it could not be released fast enough and that she had arranged for a loan of $5,000 to him from another client. He testified that he had received the $5,000 loan sometime during the first ten days of August 1987. However, respondent did not provide any documentation of this loan from another client and she neither denied nor acknowledged her client's version of the facts. Respondent stipulated that these checks were drawn on the $13,500 amount being held in escrow in her trust account for the real estate transaction.

The purchasers' attorney testified that his file notes included a notation that respondent had requested a release of one-half of the deposit funds:

"I find the following two notes on the 14th of July. It would appear from my notes I had a conversation with Ms. Kasdan in which she requested release of one half of the deposit being held. It would appear that on July 16, I discussed that situation and my notes do not spell in any greater detail what the situation was. I discussed that situation with Mr. Nathanson who turned down the request."

In mitigation, respondent testified that her mother was suffering from cancer at that time and that she had not answered the purchasers' attorney's request for information on the escrow funds because she knew she was in a compromising position for not having obtained a written authorization for the release of the escrow funds.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

At the Board hearing, new evidence was submitted explaining the checks drawn to the individuals that Mr. Goldberg had not recognized. These new documents indicated that respondent did initially lend Mr. Goldberg money from another client, Wallace Paseman. Later, when she had the escrow funds to pay back Mr. Paseman, he had directed that the checks be drawn to his landlord, Donna M. Lloyd, and others.

Mr. Goldberg testified that, after August 1987, he hired another attorney to handle the breach of contract action, filed subsequent to respondent's representation, and his entitlement to the escrow funds. Ultimately, because of the new attorney's alleged negligence, that attorney settled the suit by personally paying the $5,000 in disputed escrow funds to the purchasers.

Respondent's defense related to her psychological condition and consisted of certain documentation of psychotherapy she had received in 1989 and 1990. However, the Board rejected that defense, concluding that the reports did not demonstrate a causal link between her psychological condition and the ethics charges sufficient to constitute a mitigating factor. Further, the DRB found no mitigating circumstances that were causally related to respondent's conduct.

## II

Based on its determination of the facts, the DRB concluded that in each of the matters, respondent had violated the Rules of Professional Conduct and that public discipline was warranted. With respect to the "Davilla" matter, respondent had been suspended from the practice of law for three months on June 19, 1989. See *In the Matter of Kasdan*, 115 *N.J.* 472, 559 *A.*2d 411 (1989). The DRB found that in the course of respondent's representation of Davilla, respondent had made a false statement of material fact to the court through her appearance as an attorney and by knowingly disobeying an obligation under the rules of a tribunal. Further, respondent continued to represent Ms. Davilla while she was suspended by this Court and in the

face of the Court's express denial of respondent's request for a stay of her suspension. It also found that respondent had not properly informed her client, her adversary, and the court of her suspension. Similarly, in the "Wolkoff" matter, the DRB determined that respondent had practiced law while under the order of suspension. The DRB also found that respondent had not properly informed her client, the adversary, and the court of her suspension. Accordingly, with respect to each of those matters, the DRB determined that respondent had violated *RPC* 3.3(a) and 3.4(c) and, in addition, had violated the Rules of Professional Conduct beyond those specifically charged by failing to adhere to Guideline No. 23.

The DRB also determined that clear and convincing evidence supported the "Goldberg" complaint that respondent had failed to keep complete trust records; failed to notify the other party of the exact amount in escrow, despite numerous demands for that information; failed to safekeep funds subject to dispute, either by using the funds for her own purpose or by lending them to her client; failed promptly to deliver those funds to the other party once the court had decided that party's entitlement thereto; and had engaged in conduct involving dishonesty, fraud, and deception. That course of conduct, the Board concluded, constituted a violation of *RPC* 1.15(a) through (d) and 8.4(c).

In considering appropriate discipline, the DRB determined that respondent's previous discipline was an aggravating factor. That discipline, consisting of a three-month suspension, had been imposed for respondent's failure to communicate with her client, misrepresentation of the status of lawsuits to clients, failure to collect sufficient funds at closing, issuance of a trust-account check against uncollected funds, fabrication of trial dates, and preparation of a false pleading with the intent to deceive a client. At the time of the hearing on those matters she had not yet been reinstated. Accordingly, the Board recommended respondent be suspended from the practice of law for three years. A majority of the Board recommended that the

three-year suspension be prospective, given that respondent had practiced law during her previous suspension. In addition, the Board recommended that prior to reinstatement, respondent be required to submit competent psychiatric proof of her fitness to practice law. It also recommended that respondent be required to practice law under the supervision of a proctor. Two members of the Board voted to disbar respondent.

### III

Based on our independent review of the record, we concur fully in the findings and conclusions of the DRB.

First, with respect to the charges of mishandling escrow funds arising out of the "Goldberg" matter, the evidence does not clearly and convincingly show that respondent did not receive verbal authorization from the purchasers' attorney to release the escrow funds. The record contains no letter from the attorney documenting a refusal to release escrow funds after the postponement of the closing at the end of July. In addition, respondent's client confirmed her version that she had authorization to release the funds. Thus, the record does not clearly and convincingly demonstrate that respondent knowingly disbursed those funds without authorization. Nonetheless, the evidence does demonstrate that respondent did fail promptly to advise opposing counsel of the whereabouts and amount of escrow funds.

With respect to the "Davilla" and "Wolkoff" matters, the evidence clearly and convincingly demonstrates that respondent deliberately decided she would continue to practice law, notwithstanding this Court's unequivocal and express denial of her application to stay her three-month suspension. She misrepresented to both her adversaries and the courts her status as that of a duly licensed attorney fully eligible to practice. She admitted that she intentionally had not disclosed her suspension to the appropriate parties in either matter, reasoning that it would hurt the client's case. Furthermore, when respondent

appeared before the DRB and this Court in the prior disciplinary matter, she gave assurances that she was then able "to counsel (her) clients a hundred percent on what is happening, whether it is good or bad" and not to make misrepresentations to them. See *In the Matter of Kasdan, supra,* 115 *N.J.* at 490, 559 *A.*2d 411. Those assurances have been betrayed.

In addition to violations found by the DEC, the Board determined that each of respondent's failures to follow Guideline No. 23 constituted a separate violation of *RPC* 3.4(c). The DRB reasoned that the administrative guidelines are part of the "rules of a tribunal" and therefore imposed an ethics standard under *RPC* 3.4(c).

 Guideline No. 23 applies to every suspended or disbarred attorney. The Court's order of suspension specifically directs compliance with that guideline. *Guideline 23—Future Activities of Attorney Who Has Been Disciplined* sets forth specific requirements that must be met by a suspended attorney. They include the direction that the attorney "(1) should desist and refrain from the practice of law in any form ... and shall not appear as an attorney before any court...." Such an attorney "(3) [s]hall desist and refrain from furnishing legal services...." Further, a suspended attorney "(11) [s]hall, as to litigated ... proceedings in any court ... promptly give notice of the disciplined attorney's suspension ...," which notice must be sent by registered or certified mail to each client, the attorney of each adverse party, and the Assignment Judge with respect to any action pending in any court in the vicinage. The disobedience to a clear and firm order of this Court is an aggravating factor in assessing the nature of an ethics infraction. *See In the Matter of Goldstein,* 97 *N.J.* 545, 482 *A.*2d 942 (1984). Non-compliance with the specific requirements of Guideline No. 23 itself adds to the gravity of such a violation. *In the Matter of Cohen,* 120 *N.J.* 304, 576 *A.*2d 855 (1990). It can, as in this case, constitute an independent basis for finding a violation of *RPC* 3.4(c).

■ We conclude that respondent has violated *RPC* 3.3(a) and 3.4(c), 1.15(a) through (d), and 8.4(c). We also find that respondent's prior discipline is an aggravating factor. We likewise agree with the DRB that the documentation relating to psychotherapy received by respondent in 1989 and 1990 does not establish a defense or a mitigating factor. However, that information is relevant to respondent's fitness to practice law in the future. Respondent is therefore suspended from the practice of law for a three-year period and the three-year suspension shall be prospective. Prior to reinstatement, respondent is required to submit competent psychiatric proof of her fitness to practice law. On reinstatement, respondent shall be required to practice law under the supervision of a proctor. Respondent shall reimburse the Ethics Finance Committee for the appropriate administrative costs incurred in the prosecution of this matter.

*For suspension*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For disbarment*—None.