676 A.2d 1030

# IN THE MATTER OF J. DAVID ALCANTARA, AN ATTORNEY AT LAW.

Argued September 27, 1995—Decided December 1, 1995.

*Thomas J. McCormick*, Assistant Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*J. David Alcantara* argued the cause *pro se.*

PER CURIAM.

Respondent Jose David Alcantara was admitted to practice law in New Jersey in 1988 and is engaged in the practice of law in Ventnor, New Jersey. He has no prior ethics history.

These proceedings involve respondent's conduct during his appearance at the Atlantic County Criminal Court House in Mays Landing, New Jersey, on March 20, 1992.

## I

Respondent represented Wilfredo (Junior) Carmona, who, along with three co-defendants, were indicted for third-degree theft of a church bell. Carmona elected a trial by jury while the three co-defendants entered guilty pleas and agreed to testify for the State against Carmona. Thereafter, respondent is alleged to have engaged in improper conduct when he attempted to persuade two of the co-defendants not to testify against Carmona.

The alleged improper conduct involving witnesses in a pending criminal case caused a formal ethics complaint to be filed, in which

the following violations of the *Rules of Professional Conduct* (*RPC*) were alleged: *RPC* 3.4(a) (unlawfully obstructing another party's access to evidence); *RPC* 3.4(b) (counseling or assisting a witness to testify falsely); *RPC* 3.4(c) (knowingly disobeying an obligation under the rules of a tribunal); *RPC* 3.4(f) (requesting a person other than a client to refrain from voluntarily giving relevant information to another party); *RPC* 4.2 (communicating about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter); *RPC* 8.4(a) (violating or attempting to violate the [*RPC*]); *RPC* 8.4(b) (committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer); *RPC* 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation); and *RPC* 8.4(d) (engaging in conduct prejudicial to the administration of justice).

The District I Ethics Committee (DEC) found that respondent committed unethical conduct by knowingly disobeying an obligation under the rules of a tribunal (*RPC* 3.4(c)); requesting a person, other than a client, to refrain from voluntarily giving relevant information to another party (*RPC* 3.4(f)); communicating with co-defendants whom respondent knew or should have known were represented by other attorneys (*RPC* 4.2); violating the rules of professional conduct (*RPC* 8.4(a)); and engaging in conduct prejudicial to the administration of justice (*RPC* 8.4(d)).

The DEC recommended public discipline for those violations. The Disciplinary Review Board (DRB) found the testimony of the co-defendants was not credible and recommended dismissal of the complaint. The DRB also concluded that after the co-defendants entered guilty pleas they were no longer parties to the criminal proceedings, and respondent was therefore permitted to speak to them as witnesses without permission from their attorneys.

## II

Lonnie Campbell and Johnny Nieves, co-defendants of Carmona, were represented by Brad Wertheimer, Esq. and Bernard

Sypniewski, Esq., respectively. They negotiated plea agreements with the State in which Campbell and Nieves were required to plead guilty to third-degree theft and testify truthfully for the State in the trial of Carmona. For its part of the plea agreement, the State agreed to recommend noncustodial sentences.

On March 20, 1992, Campbell and Nieves appeared at the Atlantic County Criminal Court for sentencing by Judge Hornstine. Because Campbell and Nieves had not yet testified in the Carmona trial, Assistant Prosecutor Theodore Housel requested Judge Hornstine to postpone sentencing Campbell and Nieves. In the presence of counsel for Campbell and Nieves, the judge granted the adjournment.

It is alleged that respondent engaged in improper conversations with Campbell and Nieves after the adjournment.

Housel learned of the improper conversations when he spoke to Campbell and Nieves at the courthouse later that day to prepare for the impending trial of Carmona.

Housel testified that he obtained permission from Wertheimer and Sypniewski to interview Campbell and Nieves for the purpose of preparing them to testify against Carmona. After the adjournment motion was granted, Housel approached Campbell and Nieves outside the courtroom. Housel testified that as he approached Campbell and Nieves, "Campbell stated, 'Mr. Alcantara came up to me and told me that the reason that you're postponing the sentencing is so that I can testify in the case and you can ... stick it to me afterwards' with respect to the plea agreement." According to Housel, Campbell stated he was told by Alcantara that the prosecution intended to abandon the plea agreement once Campbell and Nieves testified against Carmona.

Housel returned to Judge Hornstine's courtroom and requested the court to bar Alcantara from engaging in further communication with Campbell and Nieves. Wertheimer also sought a similar order. Judge Hornstine granted both applications.

Housel also testified that between two and five weeks following the March 20, 1992 incident, Alcantara turned over to the prosecutor's office a video tape recording that showed Campbell and Nieves engaging in an alleged drug transaction.

Campbell and Nieves were prosecuted for distribution of a controlled dangerous substance (CDS). The prosecutor stated that the video tape was not useful in prosecuting either Campbell or Nieves because the prosecution could not corroborate that the transaction recorded on the video, in fact, involved a CDS. Nonetheless, Campbell and Nieves were eventually convicted of drug offenses and incarcerated. The theft charge against Carmona was dismissed ultimately because the prosecutor was unwilling to forego prosecuting the CDS offenses in order to obtain favorable testimony from Campbell and Nieves in the theft case against Carmona.

The testimony of Campbell is consistent with that of Nieves. Campbell testified that following the sentencing adjournment, as he was leaving the courtroom, he saw Nieves speaking to a man who introduced himself as Alcantara and stated that he was representing Carmona in the stolen bell case. Alcantara told Campbell and Nieves to take the Fifth Amendment and not testify against Carmona.

Nieves testified that,

[Alcantara] started asking me questions about the case, basically, statements about testifying, not testifying against his client ... Junior Carmona.... He told me not—he told me to plead the fifth and not testify against them. If they wanted, they could really stick it to us.

Campbell and Nieves stated that Alcantara threatened that Carmona could incriminate them in other matters because Carmona's cousin had made a video tape recording that contained images of Campbell and Nieves engaging in a drug-related transaction. Nieves stated, "[Alcantara] told us that if Junior Carmona wanted to, he could really grow horns and be a devil."

Campbell and Nieves stated that Alcantara gave his business cards to each, and asked them to make appointments to come in

and discuss the matter. Nieves testified that Alcantara terminated the conversation by stating, in effect, that their conversation never took place.

Within several minutes after respondent had spoken to Campbell and Nieves, Detective Armstrong of the Atlantic County Prosecutor's Office interviewed Campbell with regard to his conversation with Alcantara. The DEC found that Campbell's statement to Armstrong was consistent with his testimony before the DEC.

Respondent testified that as he was standing in the corridor outside the courtroom, an hispanic man approached him and asked if Alcantara was a lawyer. This man told Alcantara that he had been charged with theft of a bell. At this point, Alcantara realized that the hispanic man was a co-defendant of his client, Carmona. Respondent stated that he identified himself as the attorney for Carmona. Another man wearing a green jacket approached respondent and said nothing. Respondent stated that he asked the hispanic man if he had a lawyer, and the man responded that he had a lawyer with whom he was unhappy. Respondent gave both men his business cards and told them to contact their attorneys so that they could develop a united defense. Respondent stated that this discussion lasted fewer than sixty seconds.

Respondent further testified that Carmona gave him a video tape recording that depicted Campbell and Nieves engaging in a drug transaction. Between two and three weeks after March 20, 1992, respondent delivered that video tape to the Atlantic County Prosecutor's Office.

Wertheimer testified that respondent did not request Wertheimer's permission to speak with Campbell. Wertheimer also stated that he was unaware of the conversation between Alcantara, Campbell and Nieves as it was taking place. After the incident Wertheimer confronted respondent who admitted speaking with Campbell only for the purpose of introducing himself. Sypniewski testified that Nieves informed him that respondent

asked Nieves not to testify for the State and warned him that the prosecutor was trying to "stick it to [Nieves]."

The DEC concluded that the "evidence convinces us clearly and convincingly" that Alcantara's testimony was not credible although the testimony of Campbell and Nieves was credible. In assessing the credibility of Campbell and Nieves, the DEC placed substantial reliance on the following factors:

(1) Campbell's and Nieves' versions of the incident were consistent with one another;

(2) Nieves' testimony regarding the March 20, 1992 incident was consistent with the version he told to his lawyer immediately after the incident occurred;

(3) the testimony of Campbell and Nieves regarding the video tape was corroborated by Alcantara's actual production of the video tape; and

(4) there was no way, other than through Alcantara, that either Campbell or Nieves could have obtained information regarding the video tape.

The DRB, on the other hand, found that although "there is sufficient evidence in the record to find that the witnesses indeed had a conversation with respondent," it disagreed "with the DEC findings as to the substance and relevance of the conversation." The DRB found the testimony of "Campbell and Nieves was not credible" without explaining why.

## III

Our independent examination of the record persuades us to conclude that the testimony of Campbell and Nieves was credible. The DEC observed the witnesses' demeanor and noted the consistency between the testimony of Campbell and Nieves and their prior statements to their attorneys and Detective Armstrong. "Consistency of testimony, both internally and between witnesses, is an important indicator of truthful testimony." *In re Seaman*, 133 *N.J.* 67, 88, 627 *A.*2d 106 (1993). In addition, the evidence concerning the video tape corroborates their testimony and contradicts respondent's testimony. Considered in that light, we find a high degree of circumstantial probability of trustworthiness in the testimony of Campbell and Nieves.

The DRB also concluded that even if the witnesses against respondent were credible, the charges should nonetheless be dismissed. It reasoned:

> RPC 4.2 states that "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so." The Board concluded that the word "party" is a term of art, which specifically denotes "adversaries"—people with opposing interests. In the "stolen bell matter," Campbell and Nieves were no longer parties or co-defendants in the matter; they were only witnesses. As witnesses, they had the right to talk to respondent without their attorneys being present, if they so desired.
>
> RPC 3.4(f) states that a lawyer shall not request a person other than a client to refrain from voluntarily giving relevant information unless the lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information. The Board determined that respondent's advice to the witnesses not to testify would have benefitted the witnesses' interests, rather than adversely affect them. As with Carmona, without the witnesses' plea agreement and with no other evidence available to the prosecutor, the prosecutor would have had to dismiss the charges against Campbell and Nieves.

■ Wertheimer testified that he saw respondent in the courtroom at the time the adjournment of the sentencing motions was being argued before Judge Hornstine. He stated that respondent never requested his permission to speak to Campbell. Similarly, Sypniewski testified that respondent never asked for his permission to speak to Nieves. The testimony of the attorneys and that of Campbell and Nieves clearly and convincingly establish that respondent spoke to Campbell and Nieves with the knowledge that they were represented by counsel and without their attorneys' permission.

■ The controlling rule provides:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

[*RPC* 4.2.]

The word "party" denotes "adversaries." The DRB found that although Campbell and Nieves were co-defendants of Carmona, they were no longer adversaries but were simply witnesses be-

cause they had entered pleas of guilty. The DRB concluded that as witnesses, they could be freely contacted by respondent. This conclusion is erroneous as a matter of law.

When a co-defendant enters a guilty plea with a lenient sentence recommendation conditioned on testifying against a co-defendant such as Carmona, the testifying co-defendant is an adversary of the co-defendant who has elected to stand trial. Although Campbell, Nieves and Carmona remained co-defendants in the caption on the indictment, when Campbell and Nieves agreed to testify against Carmona, they became adversaries of Carmona. Thus, on March 20, their status was much more significant than that of mere witnesses; they were adverse-party witnesses. Accordingly, it has been clearly and convincingly established that respondent violated *RPC* 4.2.

In addition, *RPC* 3.4(f) provides that a lawyer shall not "request a person other than a client to refrain from voluntarily giving relevant information to another party unless: (1) the person is a relative or an employee or other agent of a client; and (2) the lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information." The DRB found no violation of this rule because respondent's advice to Campbell and Nieves not to testify favorably for the State was beneficial to them. This conclusion is also erroneous as a matter of law.

To begin with, the rule speaks in the conjunctive. Neither Campbell nor Nieves was a "relative or an employee or other agent" of respondent's client. Because the indictment was still pending against Campbell and Nieves and the lenient sentence recommendation depended on their testifying truthfully against Carmona, respondent could not reasonably have believed that advising Campbell and Nieves to take the Fifth Amendment or not to testify truthfully would benefit them. Significantly, Campbell and Nieves were not sentenced on March 20, because the prosecutor wanted their favorable testimony as a precondition to requesting lenient sentences. If Campbell and Nieves testified

inconsistently with their statements to the prosecutor, then the prosecutor would have been free not to make a lenient recommendation at sentencing. In the plea bargaining process, it would be difficult to conceive of a strategy more adverse to a defendant's or co-defendant's interest than to leave a court free to impose a sentence without a recommendation of leniency. Consequently, we find that a violation of *RPC* 3.4(f) has been established by clear and convincing evidence.

■ It follows that an attorney who violates *RPC* 4.2 by speaking to another attorney's client without permission, and violates *RPC* 3.4(f) by requesting that person to refrain from giving testimony favorable to the State, also violates *RPC* 3.4(c), *RPC* 8.4(a), and *RPC* 8.4(d).

## IV

■ Having found respondent guilty of unethical conduct, we must now determine what discipline to impose. Our statements in prior cases inform our present decision:

> In all disciplinary matters, public confidence in the bar requires the acknowledgment of the ethical infractions which must be sanctioned in a manner commensurate with the seriousness of the transgressions. The purpose of discipline, however, is not to punish the attorney, but to protect the public from the attorney who does not meet the standards of responsibility required of every member of the profession. *In re Templeton,* 99 *N.J.* 365, 374 [492 *A.*2d 1001] (1985). The quantum of discipline must accord with the seriousness of the misconduct in light of all relevant circumstances. *In re Nigohosian,* 88 *N.J.* 308, 315 [442 *A.*2d 1007] (1982). Mitigating factors are, therefore, relevant and may be considered. *In re Hughes,* 90 *N.J.* 32, 36 [446 *A.*2d 1208] (1982).
>
> [*In re Kasdan,* 115 *N.J.* 472, 489, 559 *A.*2d 411 (1989).]

Respondent's unethical behavior was unquestionably serious. In attempting to protect his client's interest, he crossed over the line from vigorous defense advocacy and came perilously close to bringing about a perversion of justice.

Nevertheless, it is fair to note that the DRB itself did not fully appreciate that under the circumstances respondent's conduct was unethical and clearly violated *RPC* 4.2. Further, we acknowledge that we have never previously been required to explain the status

of a defendant in a criminal prosecution as a "party" to whom access is not available as it is to non-party witnesses. In addition, we have never addressed the appropriate discipline to be imposed on an attorney who violates *RPC* 4.2. Thus, those considerations impel us to accord full weight to mitigating considerations.

▮ In this context, we sense from the record that respondent regrets the conduct. Respondent's conduct was an isolated incident on an otherwise unblemished professional record. He has also performed pro bono legal services in the past. We are, therefore, satisfied under the circumstances to reprimand respondent for his ethical failing. But for the fact that this is our first interpretation and application of *RPC* 4.2, respondent's discipline would be greater than the public reprimand recommended by the Office of Attorney Ethics and now imposed by the Court. "We caution members of the bar, however, that the Court in the future will ordinarily suspend an attorney" for the type of violation of *RPC* 4.2 that occurred in this case. *In re Magid*, 139 *N.J.* 449, 455, 655 *A.*2d 916 (1995); *In re Principato*, 139 *N.J.* 456, 463, 655 *A.*2d 920 (1995).

Respondent shall reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

So Ordered.

*For Reprimandment*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.

## ORDER

It is ORDERED that **J. DAVID ALCANTARA** of VENTNOR, who was admitted to the bar of this State in 1988, is hereby reprimanded; and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.