633 A.2d 507

IN THE MATTER OF SALLY C. PURRAZZELLA,
AN ATTORNEY AT LAW.

Argued September 29, 1992—Decided November 24, 1993.

*John J. Janasie,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Joseph Purrazzella* argued the cause for respondent (*Purrazzella and Purrazzella,* attorneys).

PER CURIAM.

The District Ethics Committee (DEC or local Committee) filed a formal complaint charging respondent, Sally Purrazzella, with violations of *RPC* 3.3(a)(1), *RPC* 3.3(a)(4), *RPC* 4.1, and *RPC* 8.4(c). Those charges grew out of respondent's alleged alteration of a psychiatric report concerning her client Sandra Saldino and respondent's submission of the altered report to the court in a matrimonial proceeding. After a hearing the local Committee concluded that respondent was guilty of the misconduct charged in the complaint and that she had run afoul of the *RPC* s cited above. In its report recommending public discipline, the Committee found specifically that respondent or someone at her direction had changed the psychiatric report and had filed it with the court in connection with a cross-motion.

After its independent review of the record the Disciplinary Review Board (DRB) agreed with the findings of the local Committee. A majority of the DRB recommended that respondent be suspended for six months; one member would have imposed a public reprimand, and one member voted to dismiss the charges for lack of clear and convincing evidence that respondent had altered the report. Because the Office of Attorney Ethics (OAE) considered the recommended six-months suspension inadequate, it sought to "expand the record" by oral argument. We granted that application and heard oral argument after issuing an Order to Show Cause why respondent should not be disbarred or otherwise disciplined.

Our *de novo* examination of the record persuades us that the ethics charges against respondent have not been established by

clear and convincing evidence. We therefore dismiss those charges.

## I

The grievant, Sandra Saldino, retained respondent, an experienced matrimonial practitioner, in October 1987 to represent her as plaintiff in divorce proceedings against her husband, whom she had married in 1981 and with whom she had one child, born in September 1985. A major source of irritation in the marital relationship was Saldino's employment arrangement. According to respondent, when the grievant first sought Purrazzella's assistance, she said that she and her husband had initially agreed that she would remain home until their two-year-old son was older, but that her husband's attitude had turned to one of resentment at her not working more than one day per week as a physician's part-time bookkeeper for a net pay of $35.79. Saldino's certification attached to a December 1987 motion for *pendente lite* support and other relief puts the matter succinctly, if somewhat crudely: "He tells me that his lawyer says that he does not have to support me and that I should go out and get a f------ job."

Respondent viewed the divorce proceedings as relatively uncomplicated: a six-year marriage of two young people with one child, no substantial assets other than a house, the wife working one day a week and the husband working full time with a net annual income of $30,000. Purrazzella did not consider alimony to be a significant issue. The sticking point in resolution of the marital dispute, at least in the beginning, was the house. The husband took the position that Saldino was entitled to no portion of the couple's $171,000 house, encumbered by a $70,000 mortgage, because he had purchased the house before the marriage, using his own money supplemented by funds from his mother. Saldino, on the other hand, contended that she and her husband had bought the house together; that she had put about $5000 of her money into the purchase price; and that although neither of them had lived in the house until after the marriage and title was in the

name of the husband only, they had agreed that it was "their" house.

Throughout the early part of 1988 the parties were unable to settle the matrimonial case. Saldino moved out of the marital home with her son in March 1988, and into her mother's home. At one Early Settlement Panel meeting that same month, Saldino's husband offered her $3000 for her interest in the marital home, which of course did not advance disposition of the case. Shortly after that conference, Saldino was admitted to the Carrier Clinic (Carrier), a psychiatric-care facility, where she remained from June 13 to August 3, 1988, suffering from depression. Purrazzella, whose letters to the grievant had gone unanswered and whose rapidly escalating bill remained unpaid, did not learn of her client's confinement until Saldino telephoned her in July 1988 to report her whereabouts and the fact that her son was in Saldino's mother's custody.

After Saldino's discharge from Carrier, negotiations toward settlement of the matrimonial case were unavailing, despite considerable progress on issues other than the distribution of the value of the marital home. When the case did not settle, custody of the couple's son—previously agreed on, until settlement negotiations broke down—became an issue, and the grievant's ability to discharge her parental obligations assumed importance on the custody question. As the husband's new attorney, Silvio Silvi, argued on his motion for transfer of custody (of which more below), Saldino had returned to live with her mother in Piscataway after being discharged from Carrier on August 3, 1988; on September 5th she had moved out of her mother's home and taken up residence with a female friend who had also been a patient at Carrier; later in September she had moved in with her boyfriend, also a former Carrier patient; on October 9th she had moved back in with her mother; and shortly thereafter she had resumed living with the boyfriend.

Given the foregoing, Silvi asked for a copy of Saldino's medical records from Carrier. Respondent testified at the disciplinary

hearing that she had attempted to have Saldino sign a release for the records, but the grievant had declined to do so. When Silvi issued a subpoena for the records, Carrier refused to comply, relying on the patient-physician privilege. Respondent also asked Saldino to execute an authorization so that she, Purrazzella, could examine the records. Again, according to respondent, Saldino declined, explaining that she might be embarrassed by her statements in those records concerning her husband's family. Saldino agreed, however, to obtain the records herself from Carrier. After she did so, she gave a copy of the discharge summary to respondent and to Dr. Raftery, the court-appointed psychologist, and kept a copy for herself.

As indicated above, the grievant's husband's lawyer, Silvi, then applied to the court for temporary transfer of the custody of the child, *pendente lite,* to his client, and for production of Saldino's medical records from Carrier. On Saldino's behalf respondent filed a cross-motion to hold defendant in contempt of court and for an order compelling payment of uncovered medical costs, including a $5,000 charge by Carrier. Appended to the cross-motion was Saldino's certification, with a copy of her discharge summary from Carrier—a document that even the husband's lawyer acknowledged at the DEC hearing was entirely irrelevant to the motion and cross-motion. The version of the discharge summary attached to the motion papers read as follows:

> When the patient came to see the writer as an out patient, she stated that because of the symptoms of depression, she is unable to function as a medical secretary and stated that she was always assertive and knew what she wanted to do.

The original discharge summary, however, contained the following:

> When the patient came to see the writer as an out patient, she stated that *she had been informed by her attorney that if she were to seek gainful employment, this may prejudice her in her ability to obtain a significant divorce settlement. The patient felt torn between that advice and her wish to work, but stated that* because of the symptoms of depression, she is unable to function. *She had worked for many years* as a medical secretary and stated that she was always assertive and knew what she wanted to do. (Emphasis added).

At the DEC hearing Saldino testified that she had signed the original certification while seated at counsel table during argu-

ment on the motion, and that at that time respondent had told her that she, Purrazzella, had removed the emphasized portion of the discharge summary quoted above because "[the doctor] should never have put the statement in there * * * because it was privileged information." Respondent adamantly denied that conversation and insisted that the document had been altered while it was still in Saldino's possession. Although Purrazzella could not pinpoint the time at which or the circumstances under which the certification had been signed, she insisted that having a client sign documents while in court for purposes of argument on a motion would have marked a clear departure from her regular practice, which was to have papers signed in her office. She pointed out that Saldino had frequently driven to her office for just that purpose. Purrazzella said that she had not learned of the alteration until receipt of the grievance, around February 2, 1989.

At the hearing on the motion and cross-motion on December 23, 1988, the trial court, after commenting on the case's "long, stormy history" (respondent's cross-motion was her third enforcement application), ruled that absent evidence of irreparable harm to the child, it could not entertain an application for emergency change of custody. After learning that Dr. Raftery had interviewed the husband and wife, the court, consistent with respondent's request (she had already submitted a copy of the discharge summary to Raftery), directed that the medical records from Carrier be released to the psychologist. Dr. Raftery was to review those records then send them to the court. Any material irrelevant to the custody of the child would then be excised. On respondent's cross-motion the court also provided for a counsel fee of $350 and costs, at a time when respondent's unpaid bill amounted to $6000 for services including eleven court appearances.

Five days after argument of the December 23rd motion respondent filed a motion to be relieved as counsel. At the DEC hearing she explained:

> I just at this point, I was so aggravated about the whole situation, that she hadn't told me she was seeing a psychiatrist, never told me she was in Carrier, never showed up at depositions, just a long list of things. Wouldn't sign the

releases. I just felt I was getting caught in this and that there was something more to this whole situation that I was going to find out at trial or something * * *, and this lady was going to end up losing custody of this child. It just, the whole thing for about eight months since June had, since July, when I guess, when I first found out she was in Carrier, I began to think maybe this lady isn't the lady—I think maybe there is something wrong here. I don't know, I just, I don't know. I just—then as the legal fees mounted and I was trying to press her for a little bit of payment, why would I tell her not to get a job if she owed me [money] and she wants to work? That makes no sense.

Respondent said that over the succeeding weeks Saldino called respondent's office on several occasions in an attempt to persuade respondent to withdraw her motion and to continue her representation. Purrazzella's refusal was followed by an incident in January 1989 when Saldino and her boyfriend appeared at the window of Purrazzella's car, which was stopped at a traffic light in the rain in Toms River. They were holding a check for $860, which they begged respondent to accept, and asked her to continue to represent Saldino. Respondent refused, pointing out that more than the grievant's delinquency in payment was involved, that "a lot of other things" had caused the lawyer-client relationship to deteriorate. The trial court ultimately granted Purrazzella's motion to be relieved as counsel. Catherine Tambasco, Esq., then took over the representation of the grievant. The matrimonial case proceeded to settlement in March 1989, with alimony being waived.

Saldino confirmed the "car" incident. Moreover, she acknowledged that had respondent not withdrawn as her lawyer, she would not have filed the ethics complaint.

We return to the altered discharge summary. At a settlement conference in March 1989, Saldino's new lawyer, Ms. Tambasco, whom Saldino had told about the alteration, related that information to Silvi, and the two lawyers in turn disclosed the discrepancy to the trial court. (At the DEC hearing the judge who had heard the December 23rd motion and cross-motion, and who had been unaware of any difference in the versions of the discharge summary until Tambasco and Silvi called it to his attention, said that "it's impossible for me to conclude * * * whether I would have been influenced on the enforcement issue * * * had I known" of

the language in the original discharge record.) Silvi, having "covered [him]self" by notifying the trial court—unquestionably the required course of action—wrote Purrazzella (who had already received the ethics complaint) requesting an explanation of the discrepancy. A couple of weeks later, during which he had received no response, Silvi happened to meet Purrazzella in the court house. He testified at the DEC hearing that in response to his question about the deletion from the original record, Purrazzella said, "Well, the information was deleted [ ] because it was privileged information[,] attorney-client work product," but she did not say anything about who had altered the document.

Purrazzella's version of the same incident was as follows:

Q  Now, do you recall running into or bumping into Mr. Silvi?

A  Yes.

Q  Relate to the Board what happened that day.

A  Well by this time I had gotten the ethics complaint from her that came, like in February. So I remember being very upset, as I think Mr. Silvi was, that this whole thing that had happened and I was being accused of it * * *. He's right, that we met crossing the hall, but it was like in front of [the] lounge area there. I don't remember him approaching me as much as I remember going up to him, because he had sent me that letter and I had not replied. I felt bad that, I thought that, he believed that I had done this, and I remember, the gist of the conversation being that I would not have attached voluntarily an altered record, then tell my client about it in an open courtroom, then filed a motion to be removed, thus pissing her off even more.

What I would have done had I found something objectionable in the report, I would * * * say to him, I don't remember, now, exact words, that there were methods of dealing with that. You can file a motion, ask the judge to review them and ask for any allegedly privileged or allegedly; what might embarrass her to be redacted from the records before it went to anyone. I mean it wasn't anything that couldn't have been dealt with very easily. We have done that with tax returns. We have done that with other things in the past.

That's my recollection of the conversation with him. At no time did I say this [to] him, I redacted it or I know someone else redacted it or changed it. And I don't fault him. I just don't think he remembers, to tell you the truth.

Q  Did you alter the records which have been talked about here all day?

A  No, I did not.

Finally, when asked whether she would have been embarrassed if the trial court had seen the original, unaltered discharge summary containing the grievant's recitation of respondent's "don't

work" advice, Purrazzella answered in the negative; she added, however, that she thought Saldino might have been upset because Saldino would know that Purrazzella had never given that advice and that the disclosure of her self-serving fabrication would further damage the already-shaky attorney-client relationship.

## II

The DRB concluded that the record contained clear and convincing evidence that respondent alone was responsible for the alteration of the report. In support of that conclusion the DRB relied on the following factors: respondent's failure to have answered Silvi's letter inquiring about the discrepancy in the reports, Silvi's testimony that Purrazzella had told him that the passage had been deleted because it was privileged information, Saldino's testimony that respondent had told her that the deleted passage contained privileged information, the absence of any motive for Saldino to alter the discharge summary, and the testimony of both the grievant and her mother that respondent had cautioned Saldino against working because of the adverse effect that her being gainfully employed would have on the divorce settlement.

In connection with the allegation that Purrazzella had told her not to work, Saldino testified before the DEC that when she retained Purrazzella, the respondent told her that she "should not * * * seek employment" because if the grievant worked, respondent "wouldn't be able to get [her] as much money." The grievant's mother, who had accompanied her daughter to respondent's office, testified that Purrazzella had "told [Saldino] that she should not work, because * * * it would be hard for her to get alimony." On cross-examination, however, when asked whether her daughter had refrained from working only because respondent had told her not to work, the grievant's mother responded that "Sandy never wanted to work."

Beyond her adamant denial that she ever told Saldino not to work, respondent's version of her initial discussion with the griev-

ant reflects an understandable absence of specific detail, but it does reveal her approach to the "work" problem in general and to Saldino's circumstances in particular.

I wish I could tell you exactly what our discussions were on the first consultation, which is usually when I discuss [work and alimony]. I can tell you that she, when I first see a client I write out completely a Schedule A of the complaint so if the client retains me they don't have to come back again. My secretary looks at my note and can do the complaint or I can dictate. My whole notes are full of her statements to me saying they had been fighting since the baby was born. The big dispute was that she didn't want to work. They had made this deal she would stay home until the child was older. The child was still in diapers. He was only two. She was very resentful of the fact he constantly said, "you are lazy, no good. You should be working like you were before."

This was volunteered by her as to what the marriage was—I mean in a matrimonial case when somebody says to you you should work, there are so many different ways that they can say that, so you can say that, well, my husband and I agree that I wouldn't work. I got this two-year old child. I don't want to put him in child care. I have nobody to watch him. I am working one day a week. Do you think that's enough? I probably would say yes. I probably would say no Judge would expect you with a two-year old in this county [where] wages are so low and child care is so high, you know, thus reinforcing what probably the client wants me to say.

But if the client comes to me and says, I can't sit another minute. I am going out to work. My mother will take care of the kids. I want to go back to work, is that all right, it wouldn't make a damn bit of sense to me, the way child support guidelines are set up.

  *   *   *   *   *   *   *   *

Q Let me just rephrase the question. Would it have made any difference in this case or significant impact on her award if she worked?

A If she worked more than she was?

Q Yes.

A I don't feel so, no, and I didn't feel so then.

Q Why not?

A Because if she had worked and made a hundred fifty dollars a week, maybe taken home like hundred forty, the guidelines would have reduced her support $2. I mean if you look at the guidelines[, they] are set up for the purpose of not penalizing someone for going out and working.

Q Was she, at least based upon your understanding of the conversations with her, able to work in nineteen, early 1988?

A You mean psychologically?

Q No, no, as far as child's care ability, that type of thing?

A It was clear to me that she didn't want to work. She was happy with the one day a week that she was doing. The husband would take care of the child free. It

was clear to me that this was a very anxiety-causing thing and many clients come in saying am I going to go to work, many. I am going to have to leave my new baby or my new child. To be honest, in that situation I would tell them, no, you don't have to go out, get a full time job, if that is the deal that you and your husband made, if that's the status quo, which is what it was.

Saldino's own handwritten answers to interrogatories propounded by her husband in the matrimonial action support Purrazzella's understanding of her client's circumstance. Particularly revealing is the following interrogatory and answer in Saldino's own handwriting furnished as part of the DEC record (respondent had sent the interrogatories to the grievant so that Saldino could supply the answers at her convenience):

80. Do you contend you are unable to seek full or part time employment because you are or would like to be the custodial parent of unemancipated children? If so, state every fact upon which you may rely upon at trial to prove why you should not have the obligation to seek full or part time employment.

Yes, because Joseph Peter Saldino, being a young child, requires my full attention and guidance as his mother for his proper development.

Moreover, in an April 1988 certification attached to one of the many motion papers filed in the matrimonial dispute, Saldino responded to her husband's affidavit, which claimed that her mother could care for the child of the marriage, as follows:

As far as my ability to work, since I was forced out of the marital home, I note in the defendant's affidavit that he says my mother can watch our son, while I go out to work full time. The defendant knows full well that my mother is employed full time and is not available for child care. I have no skills, and the only way that I could work the one day a week for Dr. Stella when I was still in the marital home, was because that was the defendant's day off and he would watch our child.

Coupled with Saldino's mother's gratuitous acknowledgement that "Sandy never wanted to work," the quoted excerpts from the DEC testimony and exhibits satisfy us that the record does not support, by clear and convincing evidence, the conclusion that respondent told the grievant not to work on pain of jeopardizing a satisfactory settlement of the matrimonial action. Indeed, the evidence strongly suggests quite the opposite—that Purrazzella would have had no reason to give such advice and that she did not do so.

The DRB found significant respondent's failure to answer Silvi's letter seeking an explanation for the alteration in the discharge

summary and Silvi's testimony that respondent had told him that the material had been deleted because it was privileged. We view Purrazzella's not answering the letter as not so much an admission of any guilt as a breach of professional courtesy—understandable, perhaps, in light of the fact that respondent had already received the grievant's ethics complaint by the time Silvi's letter arrived, and wished to respond to the charges only in the appropriate forum. In addition, knowing of that complaint, respondent would not likely have told Silvi that the material had been deleted because it was privileged—thereby giving rise to an inference that the respondent might have played some role in the deletion. Rather, we think that her explanation of how she would have handled the privileged material—a motion for redaction—and of what she recalls of her conversation with Silvi is at least as plausible as Silvi's version. On balance, we conclude that Silvi's testimony of the conversation, two-and-one-half years after the encounter in the court house, and respondent's failure to answer Silvi's letter are not helpful to respondent's position, but neither are they fatally incriminating.

We turn to the DRB's heavy reliance on what it perceived as the absence of any motive for Saldino to alter the discharge summary. We are satisfied that Saldino had both the opportunity and the motive. In that connection we have examined the two versions of the discharge summary reproduced in the record of the disciplinary hearing. The altered version gives every indication that it is the result of a somewhat primitive cut-and-paste process, from which parts of the original text have been removed and in which selected portions of the original text have been repositioned. Once attention is called to the pertinent passage, its alteration does not easily escape detection. The grievant, who herself obtained the discharge summary from Carrier, admitted that she knew how to type and that during the time period in question she had access to a photocopy machine.

That the grievant had motive to excise the recital to her treating psychologist of her lawyer's advice not to work and of her own

strong wish to resume employment is abundantly clear. As we have sought to demonstrate above, the evidence strongly preponderates in favor of our conclusion that Purrazzella never gave that advice. Saldino had to know that the statement in the record of advice never given would destroy what remained of a gradually deteriorating relationship with her lawyer—a relationship that apparently no matter how rocky, the client was bent on preserving—and would run directly counter to the information that the grievant had supplied, in her own words, in answers to interrogatories and in her certification responding to her husband's affidavit. She therefore had ample reason to remove the statement.

Finally, we are left with the question why, if Purrazzella had altered the record, she would have provided (unnecessarily) the false record to the court, then requested that that same document be given to the court's expert Dr. Raftery, to whom the original records were to be made available, thereby increasing the chances to almost a certainty that the alteration would be discovered. And why, increasing those chances even further, she would have given a copy of the altered document to Saldino and confessed to her that she had changed it at a time when their relationship had become so intolerable that within a week respondent asked to be relieved. And why, with an ethics complaint hanging over her head, respondent would have confessed her misdeed to the husband's lawyer. None of those stated propositions accords with common sense. We recognize that those events could have taken place, but their occurrence has not been demonstrated by the requisite clear and convincing evidence—evidence that "should produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Aiello v. Knoll Golf Club*, 64 *N.J.Super.* 156, 162, 165 *A.*2d 531 (App.Div. 1960).

The alleged ethical violations not having been established by the foregoing standard, we dismiss the ethics charges against Sally Purrazzella.

So ordered.

For dismissal—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—7.

## ORDER

The Supreme Court having determined from its independent review of the record that the ethics charges against respondent have not been established by clear and convincing evidence, and good cause appearing;

It is ORDERED that the ethics charges against SALLY C. PURRAZZELLA of TOMS RIVER, are dismissed and the Order to Show Cause in this matter is discharged.

WITNESS, the Honorable Robert N. Wilentz, Chief Justice, at Trenton, this 24th day of November, 1993.