**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-2708
_____

In re: RICHARD L. PRESS,
                                        Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. No. 3:11-mc-00086)
District Judge: Hon. Michael A. Shipp
_____

Submitted Under Third Circuit LAR 34.1(a)
January 26, 2016
_____

Before: JORDAN, VANASKIE, and SHWARTZ, Circuit Judges.

(Filed: February 29, 2016)

_____

OPINION*
_____

SHWARTZ, Circuit Judge.

Richard Press appeals from the Disciplinary Order entered by the full panel of

judges of the United States District Court for the District of New Jersey, finding that

Press violated two Rules of Professional Conduct ("RPC") and imposing, among other

_____

* This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7,
does not constitute binding precedent.

things, a one-year suspension from the practice of law in the District of New Jersey. For the reasons set forth below, we will affirm.

I

Press, an attorney licensed in New Jersey, represented a plaintiff in a Family Medical Leave Act ("FMLA") case before District Judge Joseph H. Rodriguez. Judge Rodriguez granted summary judgment in favor of Press's client on the issue of liability and scheduled a damages trial for April 18, 2011. Several days before the trial, Judge Rodriguez informed counsel that he would convene a pretrial status conference on April 18 to discuss the trial that would commence on April 19 and the plaintiff's proof of damages, which had troubled the Judge.

The April 18 conference took place in Judge Rodriguez's jury room, located in a secure area of the courthouse not accessible to the public. Press was familiar with the courthouse, aware that it had security cameras, and appeared before Judge Rodriguez in the past and been in his courtroom and jury room. Judge Rodriguez testified that in the course of their interactions, he had no reason to question Press's ethics or professionalism.

Press arrived late to the April 18 conference, claiming he had overslept, although Judge Rodriguez had earlier been informed that he was caught in traffic. Judge Rodriguez asked for documentary proof of damages. Press maintained that he was unaware of the reason for the conference, and had brought only his trial bag and not his whole case file, so he did not have the damages documents with him. Judge Rodriguez adjourned the conference until the afternoon so that a courier could deliver Press's file to

2

the courthouse. At no point during that proceeding did he inform Judge Rodriguez that he was ill, stressed, or sleep deprived, nor did he exhibit behavior that caused concern about his ability to represent his client.[1]

After the morning session concluded, Press remained in the jury room to review the documents he had in his trial bag. Press later testified that he left the trial bag in the jury room and went to get lunch or coffee at the Rutgers student center near the courthouse. When Press returned to the jury room, he claimed it looked like the table had been cleaned, and his trial bag was not in the room. After speaking with a janitor about his missing bag, Press informed Judge Rodriguez's chambers that his trial bag had been stolen, but he did not request a postponement of the conference or trial.[2] At no point did he retrace his steps to Rutgers or check other areas of the courthouse.

Judge Rodriguez was concerned about Press's report because it suggested there had been a security breach in the courthouse. Judge Rodriguez went on the record to ask Press about the missing bag because he "wanted to be sure [he] knew exactly what Mr. Press was contending with respect to the briefcase." J.A. 178. Judge Rodriguez repeatedly asked Press what had happened to the bag and Press insisted that it had been stolen. Press indicated he would file a police report, and Judge Rodriguez suggested he file a report with Federal Protective Services ("FPS") in the courthouse. Although Press

---

[1] We do note that in an April 13, 2011 letter brief that Press filed with pretrial documents that were due on April 8, he apologized for the untimely filing and indicated the delay was due to "a personal family emergency which kept this counsel away from work." J.A. 221, 83, 376. He did not ask for an adjournment and Judge Rodriguez accepted the late submission.

[2] Press also suggested that a janitor indicated he had seen someone in the hallway, but this claim was never substantiated.

3

represented that he could proceed with the damages argument, the courier had yet to deliver the full case file that purportedly contained documentary proof of damages.[3] In any event, Judge Rodriguez's concern about the potential security breach led him to adjourn for the day to "utilize[] the resources of the Marshals Service and the Court Security Officers, and [his] staff to search the entire area and the building to determine how a briefcase could have been stolen." J.A. 58.

Press reported the missing bag to a FPS officer in the Camden courthouse. The FPS officer told Press he would review security camera footage and Press encouraged him to do so. The footage showed Press carrying his trial bag out of the jury room and then the courthouse shortly before noon on April 18.

On April 19, the parties returned to Judge Rodriguez's courtroom, where he granted summary judgment on damages in favor of the defendant in the FMLA case because Press failed to present proof of damages, and then confronted Press about the camera footage demonstrating that Press left the courthouse with his trial bag on April 18. Judge Rodriguez explained that he would have to report Press's conduct for potential ethics violations, because "if in fact there were misstatements made to the court, untruthful statements made to the Court that caused great delay in the process of the case," disciplinary measures might be warranted. J.A. 59. Judge Rodriguez also warned that a criminal investigation might occur because "counsel also attempted to file a police report." J.A. 59. Despite the specter of an ethics referral and criminal charges, Press

---

[3] The courier delivered Press's case file to the courthouse after Judge Rodriguez adjourned the hearing for the day, and Press did not supply the judge with a copy of the purported documentary proof of damages, but rather took the case file home with him.

4

maintained that it was his "absolute belief" that he left his trial bag in the jury room, that he had "no recollection" of leaving with it, J.A. 61, and that he had no "conscious realization that [he] was fabricating something," J.A. 63, explaining that he had been sleep deprived from dealing with his mother's dialysis treatment in New York while running his law practice in New Jersey.[4] He insisted that it would be "virtually impossible [and against his] nature" to "mak[e] such statements that would be so overtly, incredibly false." J.A. 62. Press also explained that he "voluntarily" spoke with the FPS officer with full knowledge that there were cameras in the courthouse, which suggested he had not knowingly made a misrepresentation. J.A. 64. Press emphasized that he held Judge Rodriguez in "the highest regard" and would not disrespect the judge by making "such an outrageous claim." J.A. 63.

Press testified that he felt so ashamed and guilty about the incident that he had suicidal thoughts, nearly jumped off the roof of an office building later that day, and eventually checked himself into a hospital, where he remained for nearly a week. Thereafter, Press began treatment with a new psychiatrist and joined the Lawyers Assistance Program. Several judges in the District of New Jersey, including Judge Rodriguez, issued orders excusing him from jury trials and summary judgment motions in his cases for six months, so that he could address his medical issues.

---

[4] Press testified that he was working hard, trying to function the best he could, and represented that he probably would have appeared normal in court even though he was depressed, had frequent thoughts of suicide, and was taking Xanax frequently "to keep [him]self going," J.A. 267. However, Investigating Counsel elicited an admission from Press that in February 2011, Press told his prior psychiatrist that his medications were working and he was functioning well at work.

5

As he had warned Press, Judge Rodriguez informed the Chief Judge of the potential ethics violation. The Chief Judge appointed an Investigating Counsel, who charged Press with making misrepresentations of material fact to Judge Rodriguez and the FPS officer, in violation of RPC 3.3 and 4.1. The matter was referred to Judge Michael Shipp. Judge Shipp convened a disciplinary hearing at which Judge Rodriguez and Press testified to the above sequence of events. Although Press expressed remorse for his actions, and maintained that he could not recall what happened to his trial bag on April 18, he was otherwise able to recall many other aspects of that day. Judge Shipp viewed the security camera footage and received into evidence transcripts of the hearings held on April 18, and 19, 2011, as well as numerous character letters submitted by attorneys on Press's behalf.

Judge Shipp also considered the telephonic testimony of Dr. Edward Black, a psychiatrist who began treating Press several months after the trial bag incident. Dr. Black testified that Press's previous psychiatrist had prescribed a combination of drugs, including a number that likely impaired Press's cognitive function in addition to inducing drowsiness and a host of other effects. Dr. Black testified about the possibility that Press's medication may have created a memory deficit, but did not testify to a medical certainty that Press forgot what happened to his trial bag. Dr. Black admitted that he formed his opinion in reliance on Press's representations to him and that he lacked direct knowledge of Press's condition at the time of the incident because he was not treating Press at that time.

Judge Shipp issued a Report and Recommendation finding by clear and convincing evidence that Press had violated RPC 3.3 and 4.1, and that Press had not proven his medical defense. Judge Shipp recommended a one-year suspension from the practice of law, and that Press be required to both pay costs and fees associated with the disciplinary proceeding[5] and submit a mental health certification of his fitness to practice law prior to reinstatement. The full panel of District Court judges reviewed the record and briefs de novo, in accordance with L. Civ. R. 104.1(e)(11), and adopted Judge Shipp's Report and Recommendation. Press appeals.

## II[6]

"The District Court has the inherent authority to set requirements for admission to its bar and to discipline attorneys who appear before it." In re Surrick, 338 F.3d 224, 229 (3d Cir. 2003). Accordingly, "we perceive our role in reviewing the district court's action to be extremely limited." Id. at 232. We review a district court's finding of attorney misconduct and imposition of sanctions for abuse of discretion. See Adams v. Ford Motor Co., 653 F.3d 299, 303-04 (3d Cir. 2011). "[A] court abuses its discretion in imposing sanctions when it 'base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" Id. at 304 (quoting Bowers v. Nat'l Collegiate Athletic Ass'n, 475 F.3d 524, 538 (3d Cir. 2007)).

---

[5] See L. Civ. R. 104.1(k).

[6] The District Court exercised jurisdiction pursuant to its inherent authority, In re Surrick, 338 F.3d 224, 229 (3d Cir. 2003), as expressed in Local Civil Rule 104.1(e), which provides: "Every attorney authorized to practice law or appearing before this Court . . . shall be subject to the disciplinary jurisdiction of this Court." L. Civ. R. 104.1(e)(1). We have jurisdiction to review the full panel's final order pursuant to 28 U.S.C. § 1291.

Attorneys practicing in the District Court for the District of New Jersey are subject to the Rules of Professional Conduct of the American Bar Association, as revised by the New Jersey Supreme Court, <u>see</u> L. Civ. R. 103.1(a), and may be subject to discipline for violations of these rules. In an attorney disciplinary proceeding, investigating counsel bears the burden of proving a violation by clear and convincing evidence. <u>See</u> L. Civ. R. 104.1(e)(14); N.J. Ct. R. 1:20-6(c)(2)(B). If counsel meets this burden, the burden shifts to the respondent to prove any defenses or mitigating factors by clear and convincing evidence. <u>See</u> N.J. Ct. R. 1:20-6(c)(2)(C). Clear and convincing evidence is evidence that "should produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." <u>In re Purrazzella</u>, 633 A.2d 507, 514 (N.J. 1993) (internal quotation marks omitted) (dismissing ethics charges alleging that attorney altered her client's medical record, because the charges were not established by clear and convincing evidence); <u>see</u> <u>Cruzan v. Dir., Mo. Dep't of Health</u>, 497 U.S. 261, 285 n.11 (1990) ("clear and convincing evidence" is evidence that "produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue" (internal quotation marks omitted)).

## A

We first address the full District Court's finding that Press violated RPC 3.3 and 4.1. Rule 3.3, which governs candor toward the tribunal, provides: "A lawyer shall not knowingly: (1) make a false statement of material fact or law to a tribunal." RPC 3.3(a)(1). Rule 4.1 governs truthfulness in statements to others, and provides: "In the course of representing a client a lawyer shall not knowingly: (1) make a false statement of material fact or law to a third person." RPC 4.1(a)(1). The Rules define "knowingly" as "denotes actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances." RPC 1.0(f).

Mindful of the deference we accord the District Court in these matters, we cannot say it abused its discretion in finding, after it engaged in de novo review of the record, that the charged violations were proven by clear and convincing evidence.[7] The District Court concluded that the facts supported an inference that Press knowingly misrepresented the whereabouts of his trial bag to Judge Rodriguez and to the FPS officer to whom he reported the alleged theft. We cannot say that the District Court erred in viewing the evidence for that conclusion as clear and convincing.

---

[7] Press argues that because the full panel of judges was required to conduct a de novo review of Judge Shipp's Report and Recommendation, the panel erred by adopting the Report and Recommendation without providing an independent explanation of why Press's conduct violated the Rules of Professional Conduct and why a one-year suspension was appropriate. The panel represented that it adopted the Report and Recommendation after independently reviewing the record and briefs, which satisfies the de novo review requirement. The fact that some members of the full court voted for punishment different from the punishment recommended further shows that the full court conducted its own review and did not blindly accept the Report and Recommendation.

Both Judge Rodriguez and Press testified that Press appeared normal and was functioning well enough to represent his client in the FMLA matter. Moreover, at no point did Press alert Judge Rodriguez to any personal medical issues that impacted him that day. Furthermore, Press's conduct was flatly inconsistent with his statement that his trial bag was stolen: he was seen on camera leaving the courthouse with it. He engaged in this conduct after already having been late for the proceeding and professing he was unaware that the trial judge wanted to discuss the proof of damages, which apparently was a weak part of the FMLA case, and not having the required damages evidence with him. The only evidence Press offered to refute the camera footage was a plea of memory lapse or forgetfulness, which the District Court judged to be incredible, particularly in light of Press's ability to recall many other details of April 18 with specificity.[8]

Our review of a district court's credibility determination is "particularly deferential," and, as a result, we cannot say that the District Court's decision was based on a clearly erroneous view of the evidence. Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am., 609 F.3d 143, 156-57 (3d Cir. 2010); Anderson v. Bessemer City, 470 U.S. 564, 575 (1985) ("When findings are based on determinations regarding the credibility of witnesses, . . . even greater deference to the trial court's findings [is required]; for only

---

[8] Judge Shipp also dismissed Press's claim that he had no motive to lie about his bag because he knew there were many video cameras in the courthouse, and even encouraged FPS to review the footage, finding that the existence of security cameras was likely not on Press's mind when he made the misrepresentations. Judge Shipp also rejected Press's claim that he lacked a motive to delay the proceedings and there was no possibility to gain an advantage for his client through delay, because the case had a low value. Judge Shipp determined that because Press sought attorney's fees, he could have been motivated to delay the case despite its low overall value.

10

the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."). Since "the district court's account of the evidence is plausible in light of the record viewed in its entirety," we therefore "may not reverse it even [if we were] convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently." Anderson, 470 U.S. at 573-74. Because there is sufficient support for the conclusion that Press made a knowingly false statement and that his misrepresentation was material to the FMLA case as his conduct impacted the trial, we cannot say the District Court abused its discretion in finding that Press violated RPC 3.3 and 4.1.

B

We next consider the District Court's finding that Press failed to prove his medical defense by clear and convincing evidence. In asserting such a defense, Press must demonstrate "by competent medical proofs that [he] suffered a loss of competency, comprehension or will of a magnitude that could excuse egregious misconduct that was clearly knowing, volitional and purposeful." In re Jacob, 469 A.2d 498, 501 (N.J. 1984) (concluding that medical evidence of conditions including thyrotoxicosis and depression did not constitute "firmly established medical facts for a legal excuse or justification for respondent's misappropriations"); In re Cavuto, 733 A.2d 1174, 1178 (N.J. 1999) (concluding that attorney's "forgetfulness" did not "serve[] to negate or neutralize his knowing misappropriation," because his actions are "totally inconsistent with his assertion that he did not recall" that his client's medical bills were unpaid).

11

Press relied on the testimony of Dr. Black. Dr. Black did not testify to a medical certainty that Press experienced a memory lapse on April 18 and he had no direct knowledge of Press's behavior, psychological state, or pharmaceutical ingestion on April 18. Dr. Black conceded that he based his expert opinion on Press's representations to him, that he had not observed, nor was he treating Press at the time of the incident, and that his theory of Press's memory deficit was possible, but certainly not the only explanation for his conduct. For these reasons, it was not clearly erroneous for the District Court to determine that Dr. Black's testimony was not persuasive and, in light of Press's testimony that he was functioning well enough to represent his client, to further conclude that Press had failed to demonstrate by clear and convincing evidence that he had a medically caused memory lapse on April 18, 2011 regarding his trial bag. See Travelers Cas. & Sur. Co., 609 F.3d at 156-57 (deference owed to credibility determinations). Thus, the District Court did not abuse its discretion in rejecting Press's medical defense.

C

We turn finally to the discipline the District Court imposed. We also review discipline imposed for abuse of discretion. See Adams, 653 F.3d at 303-04. "The proper measure of discipline will depend on a number of factors, including the nature and number of professional transgressions, the harm caused by those transgressions, the attorney's ethical history, and whether the attorney is capable of meeting the standards that must guide all members of the profession." In re Harris, 868 A.2d 1011, 1020 (N.J.

12

2005). We also "consider the interests of the public, the bar, and the respondent." In re Musto, 704 A.2d 6, 10 (N.J. 1997).

The District Court imposed a one-year suspension, required reimbursement of costs and fees associated with the disciplinary proceeding, and mandated that Press provide a mental health certification prior to reinstatement. Attorneys who have made misrepresentations in court proceedings have received suspensions. See In re Kushner, 502 A.2d 32, 35 (N.J. 1986) (three-year suspension for "knowingly ma[king] a false certification in court to avoid liability on a promissory note"); In re Schleimer, 394 A.2d 359, 359-60 (N.J. 1978) (one-year suspension for falsely testifying at a deposition). In addition, Press's misrepresentations touched on the sensitive issue of courthouse security, resulted in the expenditure of time and resources trying to identify a purported security breach, and caused a delay in a trial. See In re Johnson, 509 A.2d 171, 174-75 (N.J. 1986) (three-month suspension for making false representations about an associate's health to secure a trial adjournment).

The District Court considered these factors as well as Press's prior transgressions,[9] his ongoing medical treatment, and character letters about his professionalism, and fashioned punishment that addressed the violations, which was similar to or less than punishment imposed for like conduct, and sought to ensure Press is able to meet the

---

[9] In 2009, Press received a public reprimand for violating Rule 8.4(b) when he was involved in an altercation in Atlantic City and damaged several cars. The District Court also considered an uncharged ethics violation under Rule 8.4(c) for Press's filing of the false report with FPS. While there is no evidence he was disciplined for such an uncharged violation, the underlying conduct was part of the circumstances of the trial bag incident and such conduct was properly considered.

13

standards of the legal profession.  See In re Kasdan, 623 A.2d 228, 234 (N.J. 1993)

(although medical evidence did not establish a defense or mitigating factor, it was

"relevant to respondent's fitness to practice law in the future").  Thus, we cannot say the

District Court abused its discretion in imposing the punishment it selected.

## III

For the foregoing reasons, we will affirm the full District Court's Disciplinary

Order.