# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0039-22

IN THE MATTER OF THE
CIVIL COMMITMENT OF
T.W., SVP 154-01.

_____

Argued September 19, 2024 – Decided September 25, 2024

Before Judges Mawla, Natali, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. SVP-154-01.

Catherine Reid, Designated Counsel, argued the cause for appellant T.W. (Jennifer Nicole Sellitti, Public Defender, attorney; Catherine Reid, on the briefs).

Stephen Slocum, Deputy Attorney General, argued the cause for respondent State of New Jersey (Matthew J. Platkin, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Stephen Slocum, on the brief).

PER CURIAM

Appellant T.W. appeals from a July 28, 2022 judgment continuing his confinement to the Special Treatment Unit (STU). We affirm.

T.W. has a lengthy and violent adult criminal history, which began in 1973, when he was arrested for sexually assaulting his fourteen-year-old nephew. In 1974, he was arrested and charged with carnal abuse, and found not guilty by reason of insanity. The following year he was arrested for sexually assaulting a fourteen-year-old neighbor and sentenced to seven years of incarceration. In 1979, he raped a young teenage male and returned to prison for three years.

Between 1979 and 1985, T.W. was arrested for non-sexual crimes. However, in 1991 he was arrested for assaulting a teenage boy. In 1992, he assaulted a teenage female. T.W. was sentenced to ten years of incarceration. While in prison, he committed many institutional infractions between 1995 and 2000, including assaults. He was transferred to the STU in 2001 and later that year committed there pursuant to the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38. T.W. incurred nineteen infractions during the first eight years for fighting, threats, assaults, and assaults with weapons. He has remained infraction-free since 2009.

In July 2022, the trial judge conducted an annual review of T.W.'s commitment, pursuant to N.J.S.A. 30:4-27.35. She considered expert testimony on behalf of the State from a psychiatrist and the treating psychologist at the

A-0039-22

STU. The treating psychologist's testimony corroborated the State's expert psychiatrist's testimony. T.W. also presented testimony from an expert psychologist. The trial judge addressed each expert's testimony in her findings.

The judge credited the testimony of the State's expert psychiatrist who interviewed T.W. and considered his STU progress reports, treatment notes, and other collateral information. The expert concluded T.W.'s mental abnormality and personality disorder predisposed him to commit acts of violence and T.W. was highly likely to engage in sexual violence, if he was not confined to the STU. The expert recounted the litany of T.W.'s institutional infractions. He also administered testing, which showed T.W. performed consistently with individuals who had a low I.Q. and were diagnosed with "mild mental retardation."

The trial judge pointed out that all three experts found T.W. has been treated at the STU for twenty years and has not advanced from his current treatment phase for approximately twelve years. The evidence showed T.W. "was not very receptive to feedback, particularly from his peers, and that he did not present his anger logs in group [therapy] during this review . . . period." T.W. struggled to apply the concepts learned in treatment. The judge found "this could be due to his low cognitive processing skills and low frustration tolerance

level, which both [of the State's experts[1]] testified to, has been a big prohibitive factor in [T.W.'s] development and . . . treatment." Because of T.W.'s "lack of ability to process information . . . [he] easily becomes agitated, often shows poor judgment, and often feels that people are against him." According to the judge, this was corroborated by the fact T.W. "did not appear to have any strong relationship to other peers at the STU, nor . . . any social network that seems to be supportive during his recovery period."

T.W. did not thrive when moved to a less-structured environment. The judge found he "has not yet demonstrated a command over his sexual assault cycle, and does not have a relapse prevention plan." She credited the State's experts who opined that the ability to devise a plan was "halted or stalled by his limited cognitive ability and his intellectual disability." This was corroborated by a November 2021 report, in which T.W. said he must stay away from boys because they are his high-risk situation. The judge was concerned about this report since T.W. had no strategy when asked how he would handle exposure to boys. T.W. had no support team and socialized with no one in the STU.

---

[1] Although both of the State's witnesses were qualified as experts, we refer to the State's psychiatrist as the State's expert and T.W.'s psychologist as the treating psychologist to differentiate them.

A-0039-22

Although T.W. claimed he was no longer aroused by children, the judge found this was not credible because in a different statement he said: "he was very concerned . . . he had to stay away from boys." The judge was concerned the lack of structure in the event of T.W.'s release would cause him to reoffend.

The judge noted the psychological testing conducted by all three experts "placed [T.W.] at an above average risk category for being charged or convicted of a sexual offense . . . ." The evidence showed T.W.'s risk of recidivism could be mitigated if he completed a sexual offender treatment program.

The judge found T.W.'s expert testimony that his prior acts were not focused on children, and therefore he was more of a rapist than a child molester not credible. T.W.'s history of sexual violence showed he favored children, and physical violence was a part of his assaults. The judge credited the State's expert that over a twenty-year span there was a "persistence of the behavior . . . and a pattern of violent offending . . . aside from the sexual activity." She also found credible the expert's view that T.W.'s numerous infractions in the STU showed he "suffers from a low frustration tolerance, difficulty in controlling his anger, and paranoia that people are doing him wrong." Although T.W. attended numerous treatment programs many were not completed, and he had limited gains.

A-0039-22

The State's psychiatric expert opined T.W.'s lack of cognition created a difficulty understanding: concepts in treatment; the causes of sexual offending; the sexual cycle; interruption and relapse prevention skills; and risky situations. Both of the State's experts diagnosed T.W. with "other specified paraphilic disorder, with a particular focus on minors and arousal to non-consenting victims, and other specified personality disorder with special traits . . . ." Further, "[a]ll experts agreed that . . . neither of these disorders spontaneously remit, and require treatment, particularly in the . . . sexual offender program."

The State's psychiatrist acknowledged the average rate of recidivism for men in their late sixties, like T.W., was fifteen percent. However, T.W.'s conflicts and behaviors "as late as 2019 and 2021 . . . were concerning because [he] has a lifelong difficulty dealing with this anger and frustration, and also continues to experience fantasies of hurting others."

The trial judge found T.W.'s expert not credible, particularly the expert's view that T.W.'s actions were not associated with his victim's ages, because four of T.W.'s victims were approximately the same age. The expert conceded T.W. would be at risk of re-offense if he could not articulate a plan for relapse prevention and other treatment. He opined that if T.W. were released he would have him carry a card containing "dos and don'ts" to prevent re-offense. The

6

judge found this would be ineffective because of T.W.'s "limited cognitive ability" and lack of improvement, despite twenty years of treatment.

T.W.'s expert opined he could be released to a Class C boarding home. The judge rejected this testimony because "there was no explanation in the testimony of how . . . such a boarding home would adequately reduce the stressors of reintegration."  The expert did not explain this plan in detail and how it would prevent re-offense.  Cross-examination revealed Class C boarding homes would not provide the sort of one-on-one monitoring or assistance T.W. required.

The judge concluded as follows:  "I do not believe that a conditional discharge plan will adequately . . . reduce [T.W.'s] dangerousness below the level of [commitment], and that is because . . . he thrives primarily in a structured environment, and that with continued treatment, he will hopefully do better."  Citing In re Commitment of W.Z. (W.Z. II), 173 N.J. 109, 132 (2002), she found the State proved T.W. "is highly likely to reoffend sexually if released in [the] general community."

T.W. raises the following arguments on appeal:

> POINT I:  THE JUDGE MISUNDERSTOOD AND MISAPPLIED THE SVPA'S THIRD PRONG LEGAL TEST IN TWO CRITICAL WAYS, REQUIRING REVERSAL.

A. The judge misinterpreted the Court's "highly likely" language, requiring reversal.

B. The judge applied the 2001 weighing test that the New Jersey Supreme Court replaced in 2002, requiring reversal.

POINT II: THE JUDGE DID NOT CONSIDER THE "ENTIRE CIRCUMSTANCES" AS REQUIRED BY LAW WHEN CONCLUDING T.W. WOULD HAVE SERIOUS DIFFICULTY CONTROLLING SEXUALLY HARMFUL BEHAVIOR SUCH THAT HE WAS HIGHLY LIKELY NOT TO CONTROL IT AND WOULD REOFFEND.

POINT III: THE JUDGE'S LEGAL CONCLUSION THAT THE STATE'S EVIDENCE MET THE APPLICABLE LEGAL STANDARD AT A CLEAR AND CONVINCING LEVEL WAS IN ERROR; THAT CONCLUSION COULD NOT BE REACHED ON THIS RECORD.

I.

"The scope of appellate review of a trial court's decision in a commitment proceeding is extremely narrow." In re J.P., 339 N.J. Super. 443, 459 (App. Div. 2001) (citing State v. Fields, 77 N.J. 282, 311 (1978)). "The reviewing judge's determination should be accorded 'utmost deference' and modified only where the record reveals a clear abuse of discretion." Ibid. (quoting Fields, 77 N.J. at 311). Deference is required because "[t]he judges who hear SVPA cases generally are 'specialists' and 'their expertise in the subject' is entitled to 'special

8

deference.'" In re Civ. Commitment of R.F., 217 N.J. 152, 174 (2014) (quoting In re Civ. Commitment of T.J.N., 390 N.J. Super. 218, 226 (App. Div. 2007)). Also, we "give deference to the findings of our trial judges because they have the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Ibid. (quoting State v. Johnson, 42 N.J. 146, 161 (1964)).

We do "not modify a trial court's determination either to commit or release an individual unless 'the record reveals a clear mistake.'" Id. at 175 (quoting In re D.C., 146 N.J. 31, 58 (1996)). "So long as the trial court's findings are supported by 'sufficient credible evidence present in the record,' those findings should not be disturbed." Ibid. (quoting Johnson, 42 N.J. at 162).

II.

In Point I, T.W. argues the trial judge ignored that the SVPA requires the State to prove that he "has serious difficulty in controlling sexually harmful behavior such that it is highly likely that he . . . will not control" it and will reoffend. W.Z. II, 173 N.J. at 132. Instead, the judge applied a balancing test from In re Commitment of W.Z. (W.Z. I), 339 N.J. Super. 549, 580 (App. Div. 2001), which the Court did not adopt in W.Z. II.

9

T.W. argues the reasoning in W.Z. I was rejected because it creates "a composite picture of 'future dangerousness'" that includes the impermissible factor of "seriousness of . . . harm." The only factor the trial judge should have considered was the likelihood of future sexually violent acts. The judge also misinterpreted W.Z. II's "highly likely" requirement as rejecting a "more likely than not standard" whereas the Court meant to direct trial courts away from using terms like "preponderance" or "more than [fifty] percent" to describe the "highly likely" standard. He asserts we should apply a de novo review because the judge mistakenly applied the law.

T.W. also alleges the judge misapplied the facts to the law. The treating psychologist did not testify that T.W. was more likely than not to reoffend, and T.W.'s expert testified his likelihood of re-offense was fifteen percent. He complains these facts and the trial judge's misapprehension of the highly likely standard show the judge mistakenly relied on the State's expert opinion.

A commitment under the SVPA requires that a person: (1) must have been "convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or . . . charged with a sexually violent offense but found to be incompetent to stand trial[;]" (2) "suffers from a mental abnormality or personality disorder" predisposing him to commit acts of sexual

A-0039-22

violence; and (3) as a result be "likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment." N.J.S.A. 30:4-27.26. The first two prongs were stipulated by T.W.

As for prong three, the SVPA defines the "likel[ihood] to engage in acts of sexual violence" as "the propensity of a person to commit acts of sexual violence is of such a degree as to pose a threat to the health and safety of others." Ibid. A person's likelihood to commit sexually violent acts "relates to the control determination that the trial court must make." W.Z. II, 173 N.J. at 130. "[T]he State must prove that threat by demonstrating that the individual has serious difficulty in controlling sexually harmful behavior such that it is highly likely that he or she will not control his or her sexually violent behavior and will reoffend." Id. at 132 (emphasis added).

The Court held the "probability of reoffending and burden of proof" should be considered distinct, and the clear and convincing burden of proof required by the SVPA "does not . . . control[] the substance of the . . . [probability] finding." Id. at 131. The Court stated that quantum of proof terminology such as "more than fifty-percent" should not be used because it would cause confusion given that "the trial court must evaluate difficult,

A-0039-22

nuanced medical evidence and reduce it to specific findings affecting a person's liberty." Id. at 131-32.

In R.F., the Supreme Court overturned our reversal of a trial court's release decision. 217 N.J. at 175. The trial court found the State did not prove by clear and convincing evidence that R.F. was highly likely to reoffend. Id. at 176.

> The experts disagreed about whether the evidence established that the [victims] were prepubescent, an important factor in assessing the nature of R.F.'s disorder; whether, given R.F.'s cognitive limitations and age, the Static-99 was an appropriate diagnostic tool for measuring his risk of sexually reoffending; and whether R.F.'s viewing the [victims] as his peers increased or decreased the risk that he would sexually reoffend. Additionally, there were conflicting accounts about whether violence was used during the sexual encounters and misunderstandings about whether R.F. built a fort and then used it to lure children.
>
> [Id. at 177-78.]

The Supreme Court found the trial judge "had a full understanding of the factual limitations in the record, and that led her to have doubt about whether the State had carried its burden." Id. at 178. The analysis did not rely on the percentage or likelihood of reoffending, but instead weighed many conflicting facts. Ibid. R.F. cautioned an appellate court not to make "its own factfindings" due to "mere disagreement with the trial court's factfindings" if the trial court based its decision on sufficient credible evidence. Ibid.

A-0039-22

The evidence presented at T.W.'s proceedings supports the understanding that predictions of re-offense are complex. Hence, the reasons for the Court's ruling in R.F.

T.W.'s expert explained the "recidivism rates for offenders who shared characteristics with [T.W.] . . . are 18.4 percent after [five] years, and [twenty-eight] percent after [ten] years, in the community." He also emphasized "these are the observed recidivism scores for individuals who share characteristics with [T.W.]. It is certainly not a specific risk estimate for [T.W.]." The State's expert also qualified his estimation of T.W.'s likelihood of reoffending the same way, noting "these numerical estimates are group estimates[,]" and "within that group, there could be variation that may be driven by other factors" specific to an individual.

The State's expert noted T.W. scored a five on the Static-99R, "which places him at above average risk for sexual reoffending." T.W.'s score on the Stable 2007 was eight, "put[ting] him at a moderate level of risk . . . ." The expert testified he "would put . . . more weight to the factors such as impulse control and the low frustration tolerance . . . that [T.W.] cannot control [his] anger." The most significant protective factor for T.W. was his age.

13

The treating psychologist testified he interviewed T.W. "a number of times over the years" and found "he tends to be cooperative" and generally well-oriented, but "not a reliable historian." As a result, it was "very difficult to assess some of the treatment concepts and his progress, because he doesn't provide a consistent presentation." The treating psychologist also identified T.W.'s risk factors regarding anger and impulse control. She noted T.W. had not received any MAP[2] placements since 2009. However, there was an altercation in 2019 involving another resident who assaulted him, and after a cool-down period, T.W. retaliated. The psychologist concluded T.W.'s actions were not self-defense, but instead the product of planning and aggression.

The treating psychologist also noted that in 2019, T.W. had issues with psychiatric stability because he struggled under stress and became overwhelmed when there was less structure. "Almost immediately, [T.W.] demonstrated poor frustration tolerance, anger, he wasn't being cooperative, he was agitated, hostile, the paranoia increased." He reacts more when he believes someone had lied about him and "he is unable or unwilling to acknowledge all of the other behaviors that were going on."

---

[2] MAP stands for "modified activity program."

14

The treating psychologist also scored T.W. a five on the Static-99R and an eight on the Stable 2007. At some point in 2021, T.W. received a seven on the Stable 2007. Although the psychologist would not state T.W.'s risk for reoffending was more than fifty percent, she testified he is "at high risk" for sexual re-offense.

The evidence amply supported the trial judge's decision. However, when the judge was discussing the standard of determining risk, she conflated W.Z. II and W.Z. I. The judge stated "W.Z. [II] allows me to weigh . . . [T.W.'s] propensity against the nature or offense of the act that he tends to commit." W.Z. II did not endorse the balancing test from W.Z. I.

In W.Z. I, we required the court to determine "the magnitude of the risk" for reoffending by considering two factors: "the likelihood of the conduct and the seriousness of the harm." 339 N.J. Super. at 573. Both factors would be granted some weight in the court's final determination because the potential harm "can vary greatly from mere nuisance-type property damage to serious bodily injury or death." Ibid. (citing State v. Krol, 68 N.J. 236, 259 (1975)). Thus, a high likelihood but lower seriousness could weigh in favor of release. Ibid. Likewise, a court could find a lower likelihood to reoffend "coupled with a high degree of seriousness" justifies commitment. Id. at 574.

15

After W.Z. I, the United States Supreme Court decided Kansas v. Crane. 534 U.S. 407 (2002). W.Z. then petitioned for certification to our Supreme Court, challenging the constitutionality of the SVPA.

Our Supreme Court said that in Crane, "the Court clarified the substantive due process limitations on a state's ability to identify the mental abnormalities that render a sex offender eligible for civil commitment because of his or her dangerousness." W.Z.II, 173 N.J. at 113. "Crane held that a state may not civilly commit a sex offender without making a determination about the person's 'lack of control' over his or her sexually violent behavior." Ibid. (quoting Crane, 534 U.S. at 411). "[T]he [Crane] Court rejected the claim that a sex offender's lack of control must be demonstrated to be total or complete; rather, the Court acknowledged a state's authority to commit those sex offenders who have 'serious difficulty in controlling [their] behavior.'" Ibid. (quoting Crane, 534 U.S. at 411) (second alteration in original).

W.Z. II crystalized the dangerousness analysis by focusing it on determining the individual's likelihood of re-offense. The Court explained:

> [T]o be within the class of persons who may be committed under the SVPA, one must be "likely to engage in acts of sexual violence." That aspect of the "dangerousness" prong of the Act is explained to mean that "the propensity of a person to commit acts of sexual violence is of such a degree as to pose a threat to the

16

health and safety of others." One's likelihood to commit such acts obviously relates to the control determination that the trial court must make. Although the "likelihood" requirement is not defined further in the Act, we import into that analysis the "serious difficulty" standard. An individual may be considered to pose a threat to the health and safety of others if he or she were found, by clear and convincing evidence, to have serious difficulty in controlling his or her harmful behavior such that it is highly likely that the individual will not control his or her sexually violent behavior and will reoffend.

[Id. at 129-30.]

T.W. suggests the following statement by the trial judge demonstrates she applied the wrong standards: "W.Z.[II] rejected the idea that scoring the likelihood to reoffend would . . . be tied to any calculation[,] or to a number[,] or to even a standard that's more likely than not, and that the [c]ourt can look at the victim impact and other factors to assess risk factor." Although the trial judge erred when she noted victim impact was an appropriate consideration because it is not tied to lack of control or the likelihood of reoffending considerations, the error was harmless because she never made a finding on victim impact. R. 2:10-2.

Our law mandates the consideration of other factors in determining likelihood-to-reoffend, lack-of-control beyond percentage calculations, and actuarial tables, and requires courts to obtain a comprehensive picture. See Doe

17

v. Poritz, 142 N.J. 1, 33 (1995); W.Z. II, 173 N.J. at 132; In re Commitment of A.Y., 458 N.J. Super. 147, 172 (App. Div. 2019). The trial judge fulfilled this obligation when she found T.W. "functions well under less stressful environments as evidenced by his difficulty in regulating his emotions in a more stressful environment . . . ." She noted he did not thrive when he got into an altercation and had to be removed to a less-structured environment. The judge also satisfied W.Z. II when she found T.W. lacked "command over his sexual assault cycle, and does not have a relapse prevention plan. And . . . his ability to be able to come up with a relapse prevention plan is halted or stalled by his limited cognitive ability and his intellectual disability."

The likelihood of reoffending was addressed by the judge when she said she was "particularly concerned" by a report from November 30, 2021, in which T.W. stated he needed to be away from boys because they "are his high[-]risk situation." The Static-99R scores, further supported this conclusion. As did the judge's findings regarding the duration of T.W.'s history of threats and violence demonstrated a "persistence of the behavior, and . . . a pattern of violent offending[,]" as well as his history of infractions in STU.

The trial judge's detailed analysis of the relevant facts shows her decision rested on sufficient credible evidence in the record. The experts did not differ

meaningfully in their risk assessments, and the judge went beyond the percentage risk valuations to consider a multitude of risk factors. We are unconvinced the harmless error committed by the trial judge led to an unjust result. The facts amply demonstrate T.W.'s commitment was warranted.

III.

In Point II, T.W. argues two experts opined he would not benefit from further STU treatment and the trial judge did not consider his entire circumstances, including the conditions under which he might be discharged and their impact on his likelihood of reoffending. He asserts the judge only considered three conditions, namely: a Class C boarding house, group therapy, and a therapeutic technique proposed by his expert. He claims the judge should have considered the other control options, including: GPS monitoring, parole officer supervision, individual therapy, polygraphs, potential home confinement, internet and phone restrictions, and substance testing. He notes the registration and monitoring required by the SVPA would also serve as a bulwark against reoffending because law enforcement would have his picture, home and work addresses, and would go door-to-door showing his photograph to neighbors, schools, and youth organizations, as required by statute.

A-0039-22

"Commitment laws were enacted to strike a balance between the interest of safety for the individual and the community, and the fundamental liberty interests of the person the State seeks to commit." In re Commitment of J.J.F., 365 N.J. Super. 486, 502 (App. Div. 2004) (citing N.J.S.A. 30:4-27.1b). "To attain the balance that the SVPA seeks, the court must consider the entire circumstances of the individual, including conditions imposed on the individual that affect the safety of the community." Ibid.

Our review of the record convinces us the trial judge considered the entire circumstances as required by J.J.F. The controls T.W. claims were unaddressed did not outweigh the judge's findings that T.W. lacked the ability to control his dangerous or violent behavior and that his behavior worsened in a less controlled environment than the STU. As the judge noted, the testimony T.W. presented did not explain how "a boarding home would adequately reduce the stressors of reintegration" and T.W.'s expert did not "explain in detail, why the plan would assure no re[-]offense . . . ." The record supported the judge's finding T.W.'s behavior would not have improved in the group therapy he would receive in a boarding home as opposed to the one-on-one therapy he received in the STU. Contrary to T.W.'s assertions, the State's expert opined T.W. could better learn to control his behavior. And T.W.'s treating psychologist explained that,

notwithstanding his limitations, T.W. could continue to benefit from therapy. Therefore, the judge did not err when she concluded T.W.'s risk of reoffending could be further mitigated by completion of sex offender treatment in the STU.

IV.

Finally, T.W. asserts the trial judge erred in finding the State proved by clear and convincing evidence that he will have serious difficulty controlling sexually harmful behavior if released. He claims there is no evidence in the record that he presently has difficulty controlling sexual behavior at all. The evidence presented by the State about cognitive limitations impacting his ability to communicate and internalize treatment was not clear and convincing evidence of a lack of control and a likelihood to reoffend. Nor were the 2019 and 2021 altercations.

T.W. argues the treating psychologist offered the better way to assess risk was to provide him with role-playing opportunities, repeat his relapse prevention plan, develop a safety plan, and permit monitored visits in the community through the furlough process. Additionally, T.W. notes he passed the most recent polygraph administered by the State in 2018, and he has supportive relationships with a sister and nephew.

A-0039-22

"To satisfy the intermediate clear-and-convincing standard, the fact finder 'must be persuaded that the truth of the contention is "highly probable."'" In re Perskie, 207 N.J. 275, 290 (2011) (quoting 2 McCormick on Evidence § 340, at 487 (6th ed. 2006)). "Evidence that is clear and convincing 'should produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" Ibid. (quoting In re Purrazzella, 134 N.J. 228, 240 (1993)). "To meet that burden, the evidence must be 'so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the precise facts in issue.'" Ibid. (alteration in original) (quoting In re Seaman, 133 N.J. 67, 75 (1993)).

The record contained clear and convincing evidence warranting the judge's commitment decision. She was correct to be "particularly concerned" by the recency of a November 2021 report, that T.W. said he needed to be away from boys because they "are his high[-]risk situation." The evidence of persistence of T.W.'s sexual offending prior to commitment, the pattern of violence in his offenses, and his infractions in the STU were enough to form "in the mind of the trier of fact a firm belief or conviction as to the truth" of T.W.'s potential to reoffend. Perskie, 207 N.J. at 290.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0039-22